[Crim. No. 10664.   Second Dist., Div. Four.   Feb. 7, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ARSHAK SAMARJIAN, Defendant and Appellant.

Thomas F. Call, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—By information filed June 16, 1964, defendant Samarjian was accused in Count I, jointly with defendants Brady, DiSalvo and Sarich of a violation of Penal Code section 182 (conspiracy to violate section 470 of the Penal Code) on November 16, 1962; in Count II, jointly with defendant DiSalvo of a violation of Penal Code section 470 (forgery) on January 10, 1963; in Count III, jointly with defendant Brady of a violation of Penal Code section 470 (forgery) on February 12, 1963; and, in Count IV, jointly with defendant Sarich of a violation of Penal Code section 470 (forgery) on June 29, 1963.

After a trial by jury, all defendants were convicted upon all counts. DiSalvo was granted probation; Samarjian's application for probation was denied, as was his motion for a new trial, and he was sentenced to the state prison for the term prescribed by law with the sentences as to Counts II, III and IV to run concurrently with the sentence as to Count I.[1]

The facts of the case are as follows: On November 16, 1962, Samarjian approached Edwin Collins, a photoengraver, whom defendant had known. Defendant asked Collins to make a printing plate for his brother who was supposedly in the printing business. (Neither defendant nor his brother was in the printing business.) Defendant gave Collins a copy of what he wanted produced, which consisted of nine numerals pasted together in a row to be made into a single printing plate. The numerals were of a distinctive style and form resembling the numerals appearing on parimutuel tickets as used at Santa Anita and Hollywood race tracks in California and at other race tracks throughout the country, including Aqueduct Park in New York. From the copy so given him by defendant, Collins made a printing plate and proofs which he gave to defendant along with the original copy. Defendant paid Collins $3.80 for his work.

---

[1]Samarjian and DiSalvo appealed. Because no brief was filed on behalf of DiSalvo after notice was given to him pursuant to rule 17a of the California Rules of Court, his appeal was dismissed on July 21, 1965. The present appeal, thus, concerns Samarjian only. Except where otherwise indicated, the term "defendant" refers to Samarjian.

The judgment does not state whether the sentences on Counts II, III and IV are to run concurrently or consecutively with each other. The judgment being silent, these three counts, as to each other, run concurrently. (Pen. Code, § 669.)

On January 10, 1963, defendant DiSalvo presented to a cashier at the "previous day" window at Santa Anita race track, for payment, twelve $10 win tickets. The tickets, prima facie, called for a payment totalling $804. These tickets had been altered and expert testimony was to the effect that the altering was accomplished by means of the plate made by Collins for defendant. On February 12, 1963, defendant Brady was apprehended in an attempt to cash another ticket, similarly altered; and, on June 28, 1963, defendant Sarich was apprehended in the attempt to cash three more tickets, altered in the same fashion. There was no evidence that Samarjian, or any other person, accompanied either DiSalvo, Brady or Sarich at the time when and the place where the forged tickets were presented for payment.

On July 26, 1963, defendant Samarjian was arrested at Aqueduct Park, in New York, for having in his possession equipment for altering parimutuel tickets. One such item of equipment was the printing plates Samarjian had purchased from Collins, except that the plates had numbers one through 12 inclusive instead of one through nine inclusive.

The evidence indicates that Samarjian, at the time he was first observed by the officers in New York, was actually engaged in forging tickets. When arrested, he had in his possession not only the plates above referred to but other paraphernalia used in the forgery process—much of it having no other reasonable use at the time and place where defendant was arrested.

Samarjian testified that he had ordered the plates for a Floyd Johnson and had given them to a bartender at the Blue Room, a bar managed by Samarjian's brother, for delivery to Johnson, and that he never saw them again until Johnson showed them to him in New York City on July 26, at a chance meeting. Samarjian denied knowing any of the other defendants prior to the preliminary hearing on the charges against them. Joseph Samarjian testified that he never saw defendant Samarjian with DiSalvo or Brady and that as far as he knew, Samarjian did not know them.

Defendant Samarjian appeals on the following five grounds:

1. Prejudicial error in admitting into evidence statements obtained from Samarjian in alleged violation of the *Escobedo-Dorado* rule.

2. Failure of the trial court to properly admonish and instruct the jury regarding the limiting of evidence as to certain defendants only.

3. Failure to properly instruct the jury on all issues.

4. The insufficiency of evidence on all counts.

5. Prejudicial error by the prosecution in impeaching a defense witness for a misdemeanor.

I

Insofar as Count I of the information is concerned, we think that defendant's contention that the evidence was insufficient was well taken. The gist of a criminal conspiracy is an agreement, express or implied, to commit any crime or to do one or more of the acts specified in section 182 of the Penal Code. But, while many acts which further an illegal purpose may suffice to make a person an accessory before the fact at common law, and therefore a statutory principal in California, the mere aiding and abetting is not enough to create liability for the crime of conspiracy.[2] While it is true that the existence of the requisite agreement may be proved indirectly or by circumstantial evidence, still the ultimate fact to be proved is the actual existence of an agreement. (*United States* v. *Falcone* (1940) 311 U.S. 205, 210 [61 S.Ct. 204, 85 L.Ed. 128]; *Davidson* v. *United States* (1932) 61 F.2d 250, 253-255.)

This rule rests on the fact that the vice of a criminal conspiracy lies in the psychological pressure, created by the fact of a promise of future action, which the agreement imposes on each coconspirator, reducing the possibility that anyone of them might abandon the contemplated crime, either because of repentance or because of fear. But, absent an agreement to go forward with a criminal scheme, the beneficiary of assistance from a mere supplier of tools or other aids may abandon his scheme without fear of recrimination or revenge from his supplier. Thus, in *United States* v. *Falcone, supra* (1940) 311 U.S. 205, 208, the record showed that defendants had sold sugar and other materials with knowl-

[2]"It is essential to constitute the crime of conspiracy that there be an agreement or understanding between two or more persons that they shall act together. It is not necessary that the agreement shall be a formal one. It is sufficient if the minds of the parties meet understandingly, so as to bring about an intelligent and deliberate agreement. However, there can be no conspiracy without such an agreement, as neither the fact that two persons at the same time intend to do the same or similar act, nor the fact that one knows of the intention of another to do a particular act, . . . is sufficient for a conspiracy." (Miller, Criminal Law (1934) § 32, p. 108.)

"Conspiracy to violate certain laws and the violation of such laws are very different crimes." (*Briggs* v. *Board of County Commissioners* (1950) 202 Okla. 684, 686 [217 P.2d 827, 829, 20 A.L.R.2d 727, 731].)

edge that these materials were to be used in the illicit manufacture of liquor. The United States Supreme Court held that this evidence, even though accompanied by proof that defendants were well acquainted with the purchasers, was insufficient to prove that the required agreement existed.[3] In *Weniger* v. *United States* (1931) 47 F.2d 692, 695, the officials of a town permitted the unlawful sale of liquor, tipped off other parties as to impending raids by other law enforcement officers, and accepted campaign funds from the illegal sellers. Again, the court held that a finding of the existence of an agreement could not be made on these facts alone. To the same effect is *Bacon* v. *United States* (1942) 127 F.2d 985, 986-987.

In *United States* v. *Peoni* (2d Cir. 1938) 100 F.2d 401, one man sold counterfeit bills to a second who, in turn, sold them to a third, all knowing them to be counterfeit and the first man knowing that his buyer probably would sell them so as to put them into circulation. The court held that this was not enough to support a finding of conspiracy by the original seller. Other cases could be cited for the same basic proposition.[4]

Tested by the rules above set forth, we turn to examine the evidence against Samarjian on the conspiracy count.

It is, of course, true that the jury was not obligated to accept Samarjian's story as to the existence of the unproduced Johnson, or the claim that Samarjian had parted with the plates in California before the forgeries took place and did not reacquire them until he was in New York at a time after the California offenses had been committed. But a rejection of this explanation is not enough to convict. The People must prevail on their own evidence, not on a vacuum created by rejection of a defense.

---

[3] It is argued that, in *Falcone,* the goods sold were innocent articles of trade, whereas here defendant had procured articles having only an illegitimate function. As we point out below, this fact is important in deciding whether or not a seller has knowingly aided and abetted his vendee, or his vendee's vendee, so as to be liable for the substantive crimes committed by the latter. Conceivably, if there is independent evidence tending to show an agreement, the obviously criminal nature of the transaction might be a make-weight in concluding that a remote vendor was a party to a conspiratorial agreement. It is in this latter connection that the nature of the articles furnished became important in the narcotic cases discussed in footnote 4, *infra.* (Cf. *Falcone Revisited: The Criminality of Sales to an Illegal Enterprise* (1953) 53 Colum. L. Rev. 229.)

[4] Cf. the discussion of a comparable problem in *People* v. *Smith* (1966) 63 Cal.2d 779, 791-792 [48 Cal.Rptr. 382, 409 P.2d 222].

As we point out below, the evidence did support a finding that Samarjian had had possession of the plates from the time he received them from Collins and, thus, that he was a personal participant in the forgery of the several tickets herein involved. The nature of the tickets supports a further inference that the forger knew that they would probably be offered for payment as genuine tickets. But, as the cases above cited show, this is not enough. There is no evidence that Samarjian, any more than the defendants in *Falcone* or in *Peoni*, had any interest in the ultimate fate of the forged tickets. There is no evidence that he shared, or expected to share, in the anticipated profit from the passing of the tickets. As far as the record before us discloses, Samarjian (assuming that he was the actual forger) was finished when he delivered the forged tickets; as far as we know, on this record, it was immaterial to him whether his transferee used the tickets as expected, or whether the transferee repented or was scared off. It is possible, of course, that Samarjian was a party to the conspiracy alleged; but, on this record, that is no more than a suspicion.

In arguing that the evidence was sufficient to support the conviction of conspiracy, the Attorney General points out that numerous forged tickets were cashed, presumably by persons other than the named codefendants, under circumstances such that the passers were not apprehended. He also points to other facts which suggest that the use of Samarjian's plates (and presumably of his services) was wide-spread. It is also true that codefendants Brady, DiSalvo and Sarich were convicted of conspiring with each other to pass forged tickets. The Attorney General relies on a series of narcotic cases and on *United States* v. *Campisi* (1962) 306 F.2d 308, many of which stand for the doctrine that, if a supplier knows that his vendee is a member of a conspiracy and intends to use the supplier's product to further that conspiracy, the supplier is an aider and abettor of the conspiracy and therefore liable to be convicted of the conspiracy on that theory. The difficulty with that argument here is that the record, as presented to us on the evidence which the prosecution chose to present, does not show, by the required standard of proof, that Samarjian had the requisite knowledge of the supposed conspiracy among his vendees. It is clear that the jury could have found that Samarjian had a large (and in all probability a profitable) business in forging parimutuel tickets. But we have only suspicion, and not proof, that he knew anything more than that word had

circulated among would-be passers of tickets that he was available and willing to forge such tickets as any person might bring to him for that purpose.

The nature of trade in narcotics is such that, as a matter of common knowledge, the purchaser of narcotics—especially in substantial volume—will normally be acting for and on behalf of a group of other persons engaged in diluting, packaging and selling. Under these circumstances, knowledge of the probability of a conspiracy involving his customer can legitimately be attributed to the original supplier. But no such common knowledge, or such a high degree of probability of concerted action, is present in this case. A single individual may purchase, at one time, as many tickets, on the same or different horses, as he can afford. If the horses lose, he may present the losing tickets to a forger for altering, or may throw them away, in disgust, where they can be picked up and presented for forgery by some stranger. The professional forger may be suspicious of a large volume of customers, but that is not the equivalent of knowledge that there is any concert of activity among his various customers.

The Attorney General's argument would make every provider of illegal articles a conspirator with his customer if the customer were, unknown to him, acting on behalf of a criminal conspiracy. No case which we have found goes that far.

II

As the above discussion indicates, we think that there was evidence sufficient to support the finding that Samarjian had knowingly and intentionally aided and assisted in the offenses charged in Counts II, III and IV. He had procured plates which, because of their peculiar characteristics, could have had only a single, and illegitimate, purpose. He was ultimately detected, in possession of those plates, and in the act of using them for that very purpose. As we have said above, the jury could properly have concluded that he had had possession of those plates all along, and that he had committed the California forgeries just as he had committed those in New York. Whether or not he knew exactly who was to make the attempt to pass the tickets is immaterial. If he knew that the criminal purpose was to be carried out by anyone, utilizing articles supplied by him, the intent to commit the ultimate crime existed in his mind, even though not all of the details of that crime were disclosed to him.

Under the circumstances here present, the jury could properly conclude that Samarjian was an aider and abettor

of the substantive crimes charged against him and, therefore, under section 31 of the Penal Code, a principal in the commission of those crimes.

## III

██  Defendant objects that certain extrajudicial statements, made by his codefendants, were admitted into evidence without a caution to the jury that such statements were to be considered only against the respective declarants and not against Samarjian. We have reviewed the statements involved. None of them referred to Samarjian or to any part which he might have played in the overall project. At the most, they were evidence tending to show that defendants Brady, DiSalvo and Sarich knew, when they presented them for payment, that the tickets—admittedly forged by someone—were forgeries. But Samarjian's guilt of the substantive crimes did not depend on proof that the actual passers were also guilty. If, with intent that they be used to forge parimutuel tickets later to be tendered as genuine, Samarjian procured the printing plates necessary for the forgery, it is immaterial that an innocent agent was used for the ultimate step in the project; his liability existed whether or not every subsequent actor was equally guilty.

In addition, as the Attorney General points out, no request for a limiting instruction was made when the statements were offered and the trial court, in its instructions to the jury at the close of the case, properly and fully instructed the jury on the limited use of these statements. Under the circumstances, no prejudice to Samarjian appears.

## IV

██  Defendant also argues that prejudicial error was committed in admitting into evidence statements by Samarjian that were obtained in violation of the *Escobedo*[5]-*Dorado*[6] rule. On April, 7, 1964, Deputy Sheriff Ralph Williams of the Los Angeles Sheriff's Office went to New York and took Samarjian into custody for the purpose of returning him to California. Sergeant Williams told Samarjian that he wanted to discuss the case with him, and Samarjian told Williams that he would make no statement until he could consult with an attorney. Sergeant Williams asked the defendant if he knew any of the other defendants, and

---

[5] 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

[6] 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

defendant admitted that he had obtained the plates from Edward Collins. On the plane en route to Los Angeles, Samarjian made the following statement:

"Q. What was the conversation in substance? A. I asked the defendant Samarjian if he knew how he come to be caught or apprehended in New York. He stated, no, but if his lookout had been on the job—

"Q. If what? A.—his lookout had been on the job, he would never have got caught. He stated, 'All the guy had to do was give me a signal and I would have flushed the stuff down the toilet and there would have been no evidence and no trouble for nobody.'"

In addition, immediately after his arrest in New York, Samarjian made the following incriminating statement:

"Q. What did he ask the defendant? A. He asked the defendant if he cared to make a statement. He said that he would have nothing to say until he spoke to an attorney. Mr. Laughlin then asked him if he wouldn't care to help himself by making a statement, and he said, 'How much help could I get, with this stuff you've got here?' pointing to this paraphernalia that is before me now."

We need not determine whether or not the record shows that the statements were procured in violation of *Escobedo-Dorado*, nor whether the point was properly preserved in the court below. The statements acknowledged that defendant had been caught red-handed in New York and that this fact tended to incriminate him in California. This was so obviously true that it added nothing to have the defendant say so. Defendant did not admit any element of the offenses charged in California.[7] He admitted that the circumstantial evidence was incriminating and that he did not think the police would be impressed by any explanation. This attests to his intelligence, but it added nothing to the proof of his guilt. Since the statements were not confessions, and their admission was nonprejudicial, no ground for reversal appears.

## V

■ Defendant claims prejudicial error by the prosecution in impeaching a defense witness for a misdemeanor. On cross-examination, defense witness John Samarjian was asked about his conviction in Los Angeles County for conspiracy to

---

[7]Defendant did admit that he obtained the plates from Collins. But this was proved by Collins' own direct testimony; defendant's admission added nothing.

commit grand theft and receiving stolen property. It later developed that he had not served any time in, nor had he been sentenced to, the state prison. Samarjian's motion to strike the testimony regarding the felony conviction and for a mistrial was denied.

In felony-misdemeanor cases under Penal Code section 17, the punishment ordered is the test as to whether it is a felony or a misdemeanor conviction. In *People* v. *Hamilton* (1948) 33 Cal.2d 45, at page 50 [198 P.2d 873], it was said: "As to a crime which may be either a misdemeanor or a felony, depending upon the punishment imposed therefor (Pen. Code, § 17), it is the punishment specified by the sentence which determines the character of the crime 'for all purposes' (§ 17) including that of impeachment."

The general rule as set out in 1 Witkin, California Crimes (1963) section 41, at page 44, is that where the offense is alternatively a felony or misdemeanor, it is regarded as a felony for every purpose until judgment. The judge can make it a misdemeanor by a misdemeanor sentence, but if no judgment is pronounced it remains a felony. (*People* v. *Williams* (1945) 27 Cal.2d 220, 229 [163 P.2d 692]; 1 Witkin, Cal. Crimes (1963) § 41, at p. 44.) The *Williams* case quoted from *In re Rogers* (1937) 20 Cal.App.2d 397, 400 [66 P.2d 1237], as follows: "The necessary inference to be drawn from the language of section 17 of the Penal Code that 'when a crime, punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes *after a judgment imposing a punishment other than imprisonment in the state prison*,' is that *the offense remains a felony* except when the discretion is actually exercised and the prisoner is punished only by a fine or imprisonment in a county jail." (Italics in original.) Having failed to show that the conviction was a misdemeanor, the defendant cannot complain.

## VI

Defendant contends that the instructions given were insufficient to cover all of the issues in the case. We have reviewed the instructions, with particular reference to the objections argued in the briefs. We conclude that, as given, the instructions fully advised the jury on every element of the crimes charged and on every defensive position relied on by him. There was no error.

The judgment is reversed as to Count I; it is affirmed as to Counts II, III and IV; the purported appeal from the order denying a motion for a new trial is dismissed.

Files, P. J., and Jefferson, J., concurred.

Petitions for rehearing were denied on March 3 and 9, 1966, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied March 30, 1966.