[No. B069535. Second Dist., Div. Seven. Apr. 1, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID AUSTIN et al., Defendants and Appellants.

COUNSEL

Paul R. Irish, David Austin, and William Flenniken, Jr., under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack and Marc E. Turchin, Assistant Attorneys General, and Robert C. Schneider, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

JOHNSON, J.—Defendants were convicted of possession of a controlled substance for sale (cocaine), robbery and conspiracy to commit robbery. In addition, defendant Wagner was convicted of conspiracy to possess a controlled substance for sale. We conclude Wagner's conviction for conspiracy to possess a controlled substance for sale must be reversed due to insufficient evidence and the sentences of both defendants on the robbery convictions must be stayed pursuant to Penal Code section 654. In all other respects, the judgments are affirmed.

### FACTS AND PROCEEDINGS BELOW

Deputy Sheriff Jose Romero, working undercover, was contacted by defendant Wagner about the possibility of purchasing cocaine. The two met

for preliminary negotiations and Romero agreed to sell Wagner 15 kilograms of cocaine at $13,500 per kilo.

Deputy Romero and Wagner agreed to meet in a restaurant parking lot to carry out the sale. Romero met Wagner as agreed and got into Wagner's car. Wagner showed Romero stacks of cash which Romero briefly examined and calculated to be approximately $190,000. Wagner told Romero he had an additional $10,000 under the seat. Romero then told Wagner he would go to a pay telephone and have the "load car" deliver the cocaine.

At the pay phone Romero called Deputy Hartman who was supervising the operation and asked if the load car was in place. Hartman said there had been a delay and Romero should go back to the parking lot and wait. While he was waiting, Romero thought he was being observed and became nervous. He telephoned Deputy Hartman and told him he was calling the deal off. By that time Wagner had left.

Later that day, Deputy Romero called Wagner at a number Wagner had given him. He told the person who answered the telephone to tell Wagner he had called off the deal. Subsequently, Wagner paged Romero on his beeper using a prearranged code number. When Romero called Wagner back they agreed to set up the sale again at a different parking lot. This time the load car was ready in the lot when Romero arrived. Numerous deputies were also present in hidden locations. As Romero and Wagner walked to the load car so that Wagner could see proof Romero had the drugs, defendant Austin approached pointing a gun at Romero. Austin said, "Don't move or I'll kill you." He then put the gun against Romero's back. At that point, Wagner told Romero to give him the key to the load car. Romero complied.

Wagner took the key to the load car and opened the trunk exposing the cocaine to view. As he did this, Romero raised his hands in the air. At this prearranged signal deputy sheriffs converged on the scene yelling, "Police. Freeze." Wagner and Austin ran. Neither of them ever touched the cocaine. They were arrested a short time later.

Austin and Wagner were charged with conspiracy to possess a controlled substance for sale, possession of a controlled substance for sale, robbery and conspiracy to rob. Wagner was convicted on all counts. Austin was found not guilty of conspiracy to possess a controlled substance for sale and convicted on the remaining counts.

DISCUSSION

I. *The Evidence Was Insufficient to Support Wagner's Conviction of Conspiracy to Purchase or Possess a Controlled Substance for Sale.*

■ It is axiomatic a conspiracy requires at least two conspirators. (Pen. Code, § 182, subd. (a); *People v. Superior Court (Jackson)* (1975) 44 Cal.App.3d 494, 498 [118 Cal.Rptr. 702].) Wagner's conviction of conspiracy to purchase or possess cocaine cannot be upheld on the theory he conspired with his codefendant, Austin, because the jury acquitted Austin on this charge. (*People v. James* (1961) 189 Cal.App.2d 14, 16 [10 Cal.Rptr. 809, 91 A.L.R.2d 697].) Consequently, Wagner's conviction depends on there being sufficient evidence he conspired with some other person whose identity is unknown. (*Ibid.*)

■ A conviction of conspiracy requires proof the defendant and at least one other person specifically intended to agree to commit a crime, specifically intended to commit the crime, and commission of an overt act in furtherance of the agreement. (*People v. Belmontes* (1988) 45 Cal.3d 744, 789 [248 Cal.Rptr. 126, 755 P.2d 310]; (*People v. Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300]; *People v. Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116].) ■ We agree with Wagner the evidence was insufficient to establish the existence of some unknown participant in the transaction much less that such participant specifically agreed with Wagner to commit the crime of possession of a controlled substance for sale.

■ When the sufficiency of the evidence is challenged on appeal we review the entire record in the light most favorable to the judgment below to determine whether the judgment is supported by evidence which is reasonable, credible and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

We do not apply a stricter standard of review to cases, such as the one before us, in which all the evidence is circumstantial. (*People v. Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People v. Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].) Thus, the requirement circumstantial evidence must not only be entirely consistent with the theory of guilt but must be inconsistent with any other reasonable conclusion does not authorize an appellate court to reverse a judgment even though the court may itself believe the circumstantial evidence might be reasonably reconciled with the defendant's innocence. (31 Cal.3d at p. 118.)

But neither do we apply a more relaxed standard to cases involving circumstantial evidence. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 424-425 [90 Cal.Rptr. 417, 475 P.2d 649].) Thus, the judgment will be affirmed where the jury rejects the hypothesis pointing to innocence and there is substantial evidence "to support the implied finding of guilt as the more reasonable of the two hypotheses . . . ." (*People* v. *Perkins* (1937) 8 Cal.2d 502, 519 [66 P.2d 631]; accord, *People* v. *Towler, supra,* 31 Cal.3d at p. 118.)

With these principles in mind we proceed to determine whether a reasonable juror could have found from the evidence some unknown person agreed with Wagner to commit the offense of possessing a controlled substance for sale.

A. *The Evidence Was Insufficient to Establish the Existence of Unknown Coconspirators.*

■ The People contend the evidence allowed the jury to infer the existence of at least one unknown coconspirator. ■ Whether a particular inference can be drawn from the evidence is a question of law. (*People* v. *Morris* (1988) 46 Cal.3d 1, 20-21 [249 Cal.Rptr. 119, 756 P.2d 843].) A reasonable inference " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " (*Id.* at p. 21.) It must logically flow from other facts established in the action. (Evid. Code, § 600, subd. (b).) ■ Here, the inference of the existence of an unknown coconspirator is based entirely on the suspicions of the officers involved in the case and the conjecture of the prosecution.

The People contend the evidence Wagner had $200,000 in cash and was purchasing 15 kilos of cocaine supports an inference a person or persons unknown must have been involved. The theory is Wagner could not have come up with $200,000 on his own nor could he singlehandedly distribute such a large quantity of drugs. On the contrary, there are a number of ways Wagner could have acquired $200,000 which do not involve a coconspirator. For example, he could have acquired the money from previous drug transactions or he could have stolen it. These explanations are at least consistent with what we know about Wagner from the facts of this case while the explanation offered by the People, Wagner was bankrolled by a mysterious coconspirator, lacks any factual basis. Furthermore, even assuming Wagner would need help in distributing 15 kilos of cocaine, it does not logically follow these distributors would have been involved in Wagner's plans to acquire the drugs.

The People also point to evidence Deputies Romero, Hernandez and Grubb saw some "suspicious" individuals in the vicinity of the drug transactions.

Deputy Romero testified that while he was talking on a pay telephone to Deputy Hartman a man came to the adjoining telephone. Romero testified he did not pay much attention to the man at first because "I was speaking loudly to Deputy Hartman on the phone about the delay [in delivering the cocaine.]"[1] Later, Romero noted the man was not talking "but just listening with the receiver to his ear, but he wasn't doing anything." After Romero hung up, he noticed the man was looking at him as he drove away. The man was never seen again by any of the officers. The People urge the jury could have inferred the man at the pay phone was a coconspirator pretending to use the phone but in reality surveilling Deputy Romero. No juror could logically and reasonably draw such an inference. Deputy Romero admitted he was not paying any attention to the man at first and that he was talking loudly to Deputy Hartman. The man could very well have put his coins in the phone and spoken before Deputy Romero paid him any attention. The man may not have been speaking because he was merely using the phone to listen to messages on his answering machine at home or in his office. The man may have been looking at Deputy Romero because he believed he had overheard Romero discussing a drug transaction. (See fn. 1, *ante*.)

Deputy Romero testified that after the incident involving the man on the telephone, he decided to call Deputy Hartman again. This time he went into the lobby of an office building across the street from where he had placed the first call. He was "somewhat preoccupied" and "a little nervous." Deputy Romero stated: "I went into the lobby area of the office building. I came across a second individual that was inside the lobby area. We met as he was standing out by the front door. . . . We had almost bumped into each other. I noticed that he was obviously making observations of me in the parking lot and when I walked into the lobby he immediately started to go for the buttons on the elevator, started to push buttons on the elevator. . . . At this point in time I became very suspicious." Finding no telephone in the lobby, Deputy Romero left the building and never saw the man again. With deference to Deputy Romero's experience as an undercover officer dealing with drug sales, we fail to see anything suspicious about the behavior of the man in the office building much less any evidence which could reasonably connect him with Wagner.

Deputies Hernandez and Grubb testified they saw two cars in the vicinity of the parking lots where the drug sales were to take place. They suspected the individuals in these cars might be carrying out countersurveillance but they could not say whether for Wagner, Austin or someone else. Deputy

---

[1] In this loud conversation, Deputy Romero said to Deputy Hartman, "What happened? Where is the load car? The guy's got the money. He is waiting across the . . . street. What happened?"

Hernandez testified he observed the individuals in one of the cars have a brief conversation with Austin. Neither deputy offered any evidence connecting the persons in these cars with Wagner.

Finally, the People point to Deputy Romero's testimony about a telephone conversation he had with an unknown person following the first, aborted, attempt to complete the drug sale. According to Deputy Romero, after he became suspicious he was being observed he called the number he had for Wagner to tell him he was calling off the deal. The telephone was answered by a male whose voice Romero did not recognize. Romero told the person "to notify [Wagner] that the deal or the operation was off, that I thought I had seen cops in the area and that I was going to leave." Later Wagner called Romero using the beeper code Romero had previously given him. From this testimony the People argue the jury could have inferred the person who answered the phone passed Deputy Romero's message on to Wagner thus establishing this person was working with Wagner on this drug transaction. No such inference could logically be drawn. Romero did not give his beeper code to the person who answered Wagner's telephone; Wagner already had it. Thus, there is no basis for inferring the person who answered the phone passed Romero's message on to Wagner.

The foregoing constitutes the totality of the evidence pertaining to the existence of some unknown coconspirator. There is nothing in the record from which a jury could reasonably infer a coconspirator existed.

B. *There Was No Evidence Anyone Specifically Intended to Agree With Wagner to Commit the Crime of Possession of a Controlled Substance for Sale.*

As a separate and independent ground for reversing Wagner's conspiracy conviction we have concluded even if there was sufficient evidence someone other than Austin acted with Wagner in the effort to possess a controlled substance for sale, evidence of an agreement to commit the crime is missing.

■ "Conspiracy is a specific intent crime, with the intent divided into two elements: '(a) the intent to agree or conspire, and (b) the intent to commit the offense which is the object of the conspiracy.'" (*People* v. *Backus* (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837].) The intent to agree to commit a crime, which is the essential element of conspiracy, may be, and from the secrecy of the crime usually must be, established by circumstantial evidence. (*People* v. *Osslo* (1958) 50 Cal.2d 75, 94 [323 P.2d 397].) Thus, it is not necessary for the prosecution to prove the alleged conspirators made an express or formal agreement or that they ever met. (1

Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) §§ 163, 167-169 and cases cited therein.) It is necessary, however, for the prosecution to establish that the facts which are known prove beyond a reasonable doubt the existence of an agreement to commit the underlying crime.

Even if Wagner acquired some or all of the $200,000 from a third party, this would not be sufficient evidence the third party specifically intended to agree with Wagner to purchase or possess a controlled substance for sale under Health and Safety Code section 11351. ■ Evidence of an act which furthered another's illegal purpose is not, in itself, sufficient to prove the person doing the act was a member of a conspiracy to accomplish the illegal purpose. (*People* v. *Samarjian* (1966) 240 Cal.App.2d 13, 17 [49 Cal.Rptr. 180]; *People* v. *Villa* (1957) 156 Cal.App.2d 128, 134 [318 P.2d 828]; see CALJIC No. 6.18.) Under some circumstances the requisite agreement can be inferred from the furnishing of lawful goods or services with knowledge the recipient would put them to an unlawful use. (*People* v. *Lauria* (1967) 251 Cal.App.2d 471, 478 [59 Cal.Rptr. 628].) However, "[b]oth the element of *knowledge* of the illegal use of the goods or services and the element of *intent* to further that use must be present in order to make the supplier a participant in a criminal conspiracy." (*Id.* at pp. 476-477, italics in original.) ■ In the present case, there is no evidence from which the jury could reasonably infer an unknown person furnished Wagner $200,000 with knowledge of Wagner's purpose. The third person may have supplied Wagner the money intending to further some legitimate agreement between them. Or, the third person may have furnished the money intending to further an agreement between them to commit an unlawful act other than possession of a controlled substance as defined in Health and Safety Code section 11351. For example, possession of marijuana for sale is not covered under section 11351. (See Health & Saf. Code, §§ 11054, subd. (d)(13), 11357-11359.)

The above analysis also applies to the "suspicious" persons the deputies observed in the vicinity of the transactions between Romero and Wagner. Even if the evidence was sufficient to support an inference these individuals were acting as lookouts for Wagner, there was no evidence which could bridge the gap between acting as a lookout for Wagner and knowledge of Wagner's illegal purpose. And, as we explained above, without knowledge of the illegal purpose there is no basis for inferring an agreement. (*People* v. *Lauria, supra,* 251 Cal.App.2d 476-477.)

Similarly, even if the person who answered the telephone when Romero called Wagner passed Romero's message to Wagner this would not prove he knew what the message meant. Romero referred only to "the deal." There is

no evidence from which the jury could infer the person taking the message knew what Romero meant by "the deal." The person may simply have been working for an answering service.

Finally, even if it could be inferred from the large quantity of cocaine involved that Wagner would need help distributing it, such an inference does not support the further inference an agreement existed between Wagner and the distributors at the time Wagner was arrested. (Cf. *People* v. *Donahue* (1975) 46 Cal.App.3d 832, 837, 839-840 [120 Cal.Rptr. 489].)

In summary, without Austin as a coconspirator the People's case against Wagner for conspiracy to violate Health and Safety Code section 11351 is based on pure speculation and nothing more. Wagner's conviction on this count must be reversed.

## II. *There Was Sufficient Evidence of Defendants' Possession of Cocaine.*

▇▇ Wagner and Austin were convicted of possession of cocaine for sale. They contend the evidence was insufficient to establish possession. We disagree.

The evidence showed Deputy Romero, acting undercover, agreed to sell 15 kilograms of cocaine to defendant Wagner. Romero and Wagner met in a parking lot to carry out the transaction. Romero parked his car in the lot, with the cocaine in the trunk, and walked over to Wagner's car. After some discussion Romero agreed to show Wagner at least one kilogram to demonstrate good faith. The two men walked back to Romero's car. As they approached Romero's car, Austin appeared and pointed a gun at Romero. Austin told Romero, "Don't move or I'll kill you." He then ordered Romero to turn around, placed the barrel of his gun against Romero's back and stated to Romero, "If you move, I'll kill you."

At this point Wagner ordered Romero to give him the keys to the car. Romero handed Wagner the keys to the trunk and Wagner opened it exposing the cocaine to view. As Wagner opened the trunk, Romero raised his hands in the air. This was a prearranged distress signal and officers who had been surveilling the scene immediately descended on the defendants shouting "Police. Freeze." Wagner and Austin fled on foot, never touching the cocaine.

▇▇ The element of possession may be established by evidence showing the defendant had actual or constructive possession of the cocaine. Actual possession occurs when the defendant exercises direct physical dominion

and control over the item, however briefly (e.g., in the hand, clothing, purse, bag, *etc.*). (2 Witkin & Epstein, Cal. Criminal Law, *op. cit. supra*, § 1003 and cases cited therein.) Constructive possession does not require direct physical control over the item "but does require that a person knowingly exercise control or right to control a thing, either directly or through another person or persons." (CALJIC No. 12.01)

Defendants argue there is no evidence they ever exercised control, or a right to control, over the cocaine in Romero's trunk. They contend transitory possession of the trunk key did not confer control over the trunk's contents. We find defendants' argument lacking in factual and legal support.

The evidence was not simply that Wagner possessed the key to a car trunk containing cocaine. While defendant Austin held Romero at gunpoint defendant Wagner took the key from Romero and opened the trunk containing the cocaine. At that time, defendants were in constructive possession of the cocaine because it was immediately accessible to them in a place under their control. (*People v. Newman* (1971) 5 Cal.3d 48, 53 [95 Cal.Rptr. 12, 484 P.2d 1356].)[2] Thus, the evidence was sufficient to support the jury's finding defendants possessed the cocaine.[3]

III. *The Trial Court Did Not Err in Refusing to Order the People to Disclose the Identity of a Confidential Informer on the Issue of Conspiracy to Rob.*

Prior to trial, Austin sought disclosure of the identity and whereabouts of a confidential police informant known as Roberto. There was reason to believe Roberto had introduced defendant Wagner to Deputy Romero. Austin argued Roberto might offer evidence exonerating him on the conspiracy charges because, being familiar with Wagner's drug dealing, Roberto could potentially testify he was unaware of any conspiracy between Austin and Wagner to possess cocaine for sale or to rob Deputy Romero. The trial court ruled Austin had failed to demonstrate a reasonable possibility Roberto could give evidence on the issue of conspiracy which might exonerate him. (Evid. Code, § 1042, subd. (d); *People v. Borunda* (1974) 11 Cal.3d 523, 527 [113 Cal.Rptr. 825, 522 P.2d 1].)

---

[2]Defendants concede the fact the officers had no intention of allowing them to get away with the cocaine does not bear on the issue of defendants' possession. (*People v. Wesley* (1990) 224 Cal.App.3d 1130, 1145-1146 [274 Cal.Rptr. 326].)

[3]Based on the evidence described above, there is no merit to Austin's claim the court should have instructed the jury mere proximity to contraband, mere presence on the property where it is found or mere association with the person having control over the contraband is insufficient to establish constructive possession. Such an instruction, even if legally proper, was not called for by the evidence. Austin was much more than a "mere" bystander. (See *People v. Daniels* (1991) 52 Cal.3d 815, 855 [277 Cal.Rptr. 122, 802 P.2d 906].)

■ Because Austin was acquitted of conspiracy to possess cocaine for sale we need not review the trial court's ruling as it relates to that charge. As to conspiracy to rob, the trial court's ruling was correct.

In order to compel the disclosure of an informant's identity the defendant must establish a "reasonable possibility" the informant could provide exculpatory evidence. (*People* v. *Borunda, supra,* 11 Cal.3d at p. 527.) The existence of a "reasonable possibility" an informant could provide exonerating evidence must be determined on a case-by-case basis. (*People* v. *Hardeman* (1982) 137 Cal.App.3d 823, 828 [187 Cal.Rptr. 296].) Whether the informant could provide such evidence is always somewhat speculative. (*Williams* v. *Superior Court* (1974) 38 Cal.App.3d 412, 420 [112 Cal.Rptr. 485].) Where the informant is neither a participant nor an eyewitness to the charged offense the possibility is even more speculative, although still viable. (*People* v. *Lee* (1985) 164 Cal.App.3d 830, 836 [210 Cal.Rptr. 799]; *Williams* v. *Superior Court, supra,* at p. 420.) But where, as here, Roberto's only known involvement was to introduce Wagner to an undercover officer posing as a cocaine dealer, speculation passes into the realm of "unreasonable possibility" Roberto would have had any knowledge concerning Austin's involvement in a robbery of the undercover officer weeks later.

Austin also argues the court erred in not hearing testimony from Deputy Romero in camera as to Roberto's knowledge or lack of knowledge. Austin, however, waived this argument because he did not ask the court to call Romero as a witness. He merely advised the court Romero was available to testify if the court wished to hear him.

IV. *The Prosecutor Did Not Impermissibly Comment on Austin's Silence After Receiving the Miranda Warning.*

Deputy Hartman testified on direct examination that shortly after he arrested Austin, but before he gave him the *Miranda* warnings, Austin made the spontaneous statement: "I should have never gone to work for Eddie [Wagner]." On cross-examination, counsel for Austin asked Deputy Hartman whether, when Austin made this remark, he asked Austin if he would care to make "a full and complete statement" or acknowledge in writing the statement regarding going to work for defendant Wagner. Deputy Hartman replied he did neither of these things. On redirect examination, Deputy Hartman testified as follows:

"Q. Now, later on did you give [Austin] the opportunity to make a full statement to you?

"A. Yes, sir, I did.

"Q. How did you do that?

"A. With the *Miranda* card.

"Q. You advised him of *Miranda*?

"A. Yes, I did."

". . . . . . . . . . . . . . . . . . . . . . . . ."

"Q. And did he offer to give you a full statement, you having given him the opportunity?

"A. He declined."

Counsel for Austin objected to the testimony on the ground it was irrelevant whether later on Austin was given the opportunity to make a statement but exercised his right to remain silent after being given the *Miranda* warning. The question on cross-examination had been whether Austin had been given the opportunity to explain his statement regarding going to work for Wagner at the time the statement was made. The prosecutor responded, "Under general circumstances, I would not even touch this area under *Griffin*." He went on to argue, however, the question about a later opportunity to explain was relevant because defense counsel was attempting to raise an inference Austin had been denied the opportunity to explain what appeared to be a damaging admission—that he was acting in concert with Wagner in the drug buy and robbery. Austin's objection to Officer Hartman's testimony was overruled.

 On appeal, Austin contends the prosecutor's reference to his post-*Miranda* silence violated his right to due process under the *Griffin/Doyle* line of cases. (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240].) We disagree.

*Griffin* and *Doyle* were cases in which the prosecution sought to take unfair advantage of the defendant's silence. In *Griffin*, the court held due process and the privilege against self-incrimination prohibit the prosecution from commenting on the defendant's failure to testify on his own behalf. In *Doyle*, the court held due process prohibits the use of a defendant's silence at the time of arrest and after receiving *Miranda* warnings to impeach an affirmative defense raised at trial. These cases stand for the principle it is fundamentally unfair for the state to afford defendants the right to

remain silent and then use that silence against them. It must be remembered, however, the defendant's right to remain silent is a shield. It cannot be used as a sword to cut off the prosecution's "fair response" to the evidence or argument of the defendant. (*United States* v. *Robinson* (1988) 485 U.S. 25, 32 [99 L.Ed.2d 23, 31, 108 S.Ct. 864].)

*Robinson* is particularly relevant to the present case. There, defense counsel argued to the jury that throughout its investigation the government had unfairly denied defendant the opportunity to explain his actions. In rebuttal, the prosecutor told the jury, "[Defendant] could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." (485 U.S. at p. 28 [99 L.Ed.2d at p. 29].) The court held the prosecutor's comment was not improper.

"Where the prosecutor on his own initiative asks the jury to draw an inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege." (485 U.S. at p. 32 [99 L.Ed.2d at p. 31].)

Similarly, in *Amirault* v. *Fair* (1st Cir. 1992) 968 F.2d 1404, 1406, the petitioner raised *Griffin/Doyle* error on habeas corpus. The defense in the underlying trial argued the prosecution was biased against defendant because no one ever asked him to explain his side of the story. The prosecutor responded the law forbids the state from approaching the defendant after his arrest, but the law does not prevent the defendant from affirmatively telling his side of the case. The court held this comment was a permissible "fair response" under *Robinson*.

 In the present case, as in *Robinson* and *Amirault*, defendant Austin sought to create the impression in the jurors' minds the police had treated him unfairly by not giving him the opportunity to explain his damaging statement to Deputy Hartman and to use the fact he had invoked his right to remain silent to prevent the prosecutor from countering this impression. The Fifth Amendment protects defendant's right to remain silent. It does not protect his effort to exploit his silence by requiring the government also remain silent. Here, the prosecutor's purpose on redirect examination of Deputy Hartman was to correct the impression created on cross-examination Austin had not been afforded an opportunity to explain the apparently damaging statement he made to Hartman. There was no attempt to suggest defendant's invocation of his right to remain silent was substantive evidence

of guilt or to impeach a defense by bringing out Austin's postarrest silence. The rationale of *Griffin* and *Doyle* is inapplicable.

### V. *The Trial Court Erred in Imposing Sentences for Robbery and Possession of Cocaine for Sale Because These Offenses Constituted an Indivisible Criminal Transaction.*

 Wagner contends the trial court erred in sentencing him to consecutive sentences for possession of a controlled substance for sale and robbery. He is correct.

Section 654 of the Penal Code provides in relevant part, "An act or omission which is punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." This section applies not only when there is one act in the ordinary sense, but when a course of conduct constitutes one indivisible transaction. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 637 [105 Cal.Rptr. 681, 504 P.2d 905].)

The facts of this case show, indisputably, the defendants had but one intent and objective and that was to obtain possession of a large quantity of cocaine which they could then sell; the robbery of the trunk key and the cocaine itself was merely the means to that end. Therefore, defendants may be punished for the more serious of the crimes, but not for both. (8 Cal.3d at p. 640.)[4]

*People* v. *Quinn* (1964) 61 Cal.2d 551 [39 Cal.Rptr. 393, 393 P.2d 705] is directly on point. There, defendant robbed a pharmacy taking cash and narcotics. He was convicted of robbery and possession of narcotics. His conviction was reversed on other grounds but the court addressed the sentencing issue because it might arise on retrial. The court stated: "In the present case, the theft and possession of the narcotics, the theft of the money, and the robbery were all part of an indivisible criminal transaction. . . . Accordingly, if on retrial defendant is convicted of both possession of narcotics and robbery, he may be sentenced only for first degree robbery, the more serious of the two offenses." (*Id.* at p. 556.)

We are not persuaded by the reasoning in *People* v. *Spangler* (1980) 113 Cal.App.3d 1039, 1047 [170 Cal.Rptr. 406] which held a defendant could be punished for both robbery and possession of narcotics for sale on the ground ". . . the elements of the crime of unlawful possession of controlled substances for the purpose of sale were not complete with the robbery but

---

[4]This analysis does not apply to the independent crime of conspiracy to commit robbery.

included evidence of repackaging the drugs and other preparations for selling them, all taking place long after the robbery had been committed."

■ Contrary to the view expressed in *Spangler*, possession of narcotics for sale is established by proof the defendant possessed a controlled substance for the purpose of selling it. (*People v. Newman* (1971) 5 Cal.3d 48, 52 [95 Cal.Rptr. 12, 484 P.2d 1356].) Intent to sell can be established circumstantially by the quantity of the drugs in defendant's possession. (*Id.* at pp. 51, 53 [4.5 grams of methedrine]; *People v. Grant* (1969) 1 Cal.App.3d 563, 570 [81 Cal.Rptr. 812] [six ounces of uncut heroin].) Here, defendants possessed *15 kilograms* of cocaine. ■ There is no requirement defendants must have repackaged the drugs or taken other steps in preparation for sale. Indeed, if such a requirement existed, defendants' convictions of possession for sale would have to be reversed because it is undisputed defendants never even touched the cocaine much less prepared it for sale. (See discussion, *ante*, p. 1608.)

■ Where Penal Code section 654 prohibits punishment for both offenses making up an indivisible course of conduct, the proper judgment is to impose sentence on the greater crime and stay the sentence on the lesser, such stay to become permanent when service of sentence for the greater offense is completed. (*People v. Beamon, supra*, 8 Cal.3d at p. 640; *People v. Masten* (1982) 137 Cal.App.3d 579, 591 [187 Cal.Rptr. 515].) Although robbery carries a higher upper term than possession of a controlled substance for sale (Pen. Code, § 213; Health & Saf. Code, § 11351), because of the weight involved here the latter offense requires the imposition of a 10-year enhancement under Health and Safety Code section 11370.4, subdivision (a)(3). Therefore, we will treat possession for sale as the greater offense and robbery as the lesser. (Cf. *People v. Salazar* (1987) 194 Cal.App.3d 634, 636-637 [239 Cal.Rptr. 746].)

VI. *Austin Was Properly Sentenced for Personal Use of a Firearm.*

The information alleged in count III (robbery) and count IV (conspiracy to commit robbery) Austin personally used a firearm and that a principal was armed with a firearm. As to each count, the jury found the personal use allegations true but the allegations a principal was armed untrue. Austin argues this inconsistency requires reversal of the enhancements for personal use of a firearm even though he concedes, as to both counts, there was sufficient evidence he personally used a firearm.

There is no merit to Austin's argument. (Pen. Code, § 954; *People v. Brown* (1989) 212 Cal.App.3d 1409, 1420-1421 [261 Cal.Rptr. 262].)

## DISPOSITION

With respect to defendant Wagner, the judgment is reversed as to the conviction of conspiracy to possess a controlled substance for sale and modified to stay the sentence for robbery, the stay to become permanent upon Wagner's completion of the remaining terms imposed. In all other respects the judgment is affirmed.

With respect to defendant Austin, the judgment is modified to stay the sentence for robbery, the stay to become permanent upon Austin's completion of the remaining terms imposed. In all other respects the judgment is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

Appellants' petition for review by the Supreme Court was denied June 29, 1994.