[No. G024061. Fourth Dist., Div. Three. July 31, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL GORDON ALLEYNE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV and V.

**COUNSEL**

Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**O'LEARY, J.**—Paul Gordon Alleyne appeals his conviction for conspiracy to commit murder, premeditated attempted murder, and robbery, with enhancements for personally using a firearm, inflicting great bodily injury, and committing the crimes while on bail. He contends: (1) the evidence was insufficient to prove an overt act necessary for the conspiracy conviction; (2) the trial court erred by instructing the jury as to overt acts that could not support the conspiracy charge; (3) the court improperly allowed the jury to consider overt acts committed after the conspiracy's termination; (4) the court erroneously failed to instruct the jury it must unanimously agree as to any overt act used to support the conspiracy conviction; and (5) the court erred by admitting evidence Alleyne transported marijuana for sale. We affirm.

James Wengert, the victim, owned a business which located hidden assets. Beginning in 1992, Wengert dealt with Coleman Allen's factoring business. Allen would advance Wengert 80 percent of the value of Wengert's business invoices, and Wengert's clients were instructed to pay Allen's company the amount due.

By 1994, the business relationship had gone sour. If Wengert's clients failed to pay Allen, Wengert was liable for the amount owed plus fees and interest. Allen claimed Wengert owed about $438,000; Wengert argued it was closer to $216,000, less payments. Allen pressed Wengert for security for the debt, and Wengert provided a deed of trust he forged on his wife's separate property. Allen also convinced Wengert to obtain a $500,000 insurance policy on his life, listing Allen's company as beneficiary. Wengert began to submit faked invoices to Allen and used the proceeds to repay his debt. Allen foreclosed on Wengert's wife's property, and lawsuits eventually ensued. At some point, Allen, an intense man with a hot temper, said to an employee that he wanted to kill Wengert, although he did not say why.

In February 1995, Allen asked Wengert to do a financial investigation for him, promising to credit Wengert's fee against his debt. After two failed attempts to meet with the subject of the investigation, Allen arranged for Wengert to meet with the man at an abandoned warehouse in Los Angeles. When Wengert arrived, a man, who was not Alleyne, came up to Wengert and said, "You're supposed to meet somebody here." Wengert acknowledged he was correct.

The man explained there was a "hit out on [Wengert]" and displayed a gun. The man said Wengert's business partner had arranged the killing, but the man could not go through with it. The man told Wengert to give him his wallet and said he would fire a round so his associate around the corner would believe the killing had taken place. Wengert complied, and as he drove away, he heard a gunshot. When Wengert called Allen and told him what happened, Allen replied, "I don't need this . . ." and hung up.

In June 1995, Wengert's wife sued to recover the foreclosed property. A few days later, Jane Carver was shot near a Fountain Valley park. Wengert and his wife lived in Fountain Valley at the time. Leonard Mundy was charged almost a year later with the killing. Mundy had visited Allen's business on several occasions. Mundy obtained a $40,000 loan from the business in August 1995, paid it back within a month, and obtained an additional $40,000 which was written off as uncollectable in December 1995.

Wengert attended Mundy's arraignment in May 1996. He concluded Mundy had been hired to kill his wife and had mistakenly killed the wrong

person. Mundy made eye contact with Wengert and appeared to be fixated on him during the arraignment.

Before that arraignment, however, Wengert experienced a travail that gave rise to the charges in this case. In late February 1995, Alleyne had arranged to buy $25,000 worth of marijuana in Mendocino County and sell it in Los Angeles for a $5,000 profit. About a week before the purchase, he borrowed $30,000 from Allen. This transaction was unusual for Allen's business because the loan agreement expressly dispensed with the necessity of a TRW search. Alleyne's game plan went awry when he was arrested with the marijuana on March 6 near Bakersfield.

Just over a month later, two days before a court hearing in an Allen-Wengert suit, Wengert arrived at his office building in San Clemente early one morning. While he was waiting for the elevator in the underground parking garage, a man got out of the passenger side of a car and approached him with a gun. Wengert later identified Alleyne from a photographic lineup and at trial as the man who approached. Alleyne raised his gun and demanded Wengert's wallet. After Wengert complied, Alleyne shot him once in the jaw.

Wengert fell to the ground and played dead. As Alleyne walked back to the car, Wengert heard it start. He saw the car leave, and then he arose and sought medical attention. Although Wengert's wallet was taken, Alleyne did not take his valuable watch or ring.

Unbeknown to Alleyne, Allen had died four days before the shooting. Five days after the shooting, Alleyne called Allen's business and asked if Allen had prepared another note for him. When the employee said he had not, Alleyne said he would need to speak to Allen's wife.

Allen's wife was not there, but she called Alleyne within a day or two. Alleyne said Allen owed him $45,000, and Mrs. Allen said she did not know what he was talking about. Mrs. Allen hired an attorney and an investigator, David Warkentine, to assist her with the issue.

Warkentine called Alleyne, who told Warkentine that Allen had entered into an agreement with third parties, people with whom Mrs. Allen would not want to deal. After a telephone conversation in which Mrs. Allen verified Warkentine represented her, Alleyne agreed to meet with Warkentine.

At that meeting, Alleyne told Warkentine the debt involved a hit on a man in San Clemente who owed Allen money and had sued him. Allen did not

want the man to appear at a scheduled court hearing. Although Allen was also angry with Alleyne's friend, Leonard Mundy, and wanted a hit made on him as well, Alleyne talked Allen out of it. Alleyne was not successful in talking Allen out of the hit on Wengert, however. Allen arranged for Alleyne to pay some men to carry out the hit. All these men wanted was the agreed $45,000 payment for the job.

Warkentine told Alleyne time was needed to consider the matter, and Alleyne agreed. Warkentine, of course, notified the police. A search of Alleyne's car repair business yielded a handgun cleaning kit that had been used.

Alleyne's defense at trial focused primarily on Wengert's identification of him as the shooter. Several of his friends testified he did not have a beard, an earring, or sweat suit, all of which Wengert had attributed to the shooter. A dermatologist and a defense investigator provided corroboration Alleyne could not grow a beard. An expert witness on eyewitness identification explained several factors in the case that made Wengert's identification unreliable. Alleyne also offered evidence Wengert was not a trustworthy person.

I

Alleyne contends the evidence was insufficient to prove an overt act necessary for the conspiracy conviction. Not so.

To prove a conspiracy, the prosecution must show: "(1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or conspiracy. [Citations.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1128 [54 Cal.Rptr.2d 578].) Although several overt acts may be alleged, the prosecution need only prove one. (See *People v. Cribas* (1991) 231 Cal.App.3d 596, 611-612 [282 Cal.Rptr. 538].)

Two of the overt acts alleged were that Alleyne aimed a gun at Wengert and shot him. Alleyne concedes, at least inferentially, the evidence was sufficient to prove those acts—he does not challenge his conviction for attempted murder or the enhancements that he personally used a firearm and inflicted great bodily injury. Instead, he argues those acts were not in furtherance of the conspiracy because the conspiracy terminated when Allen died. He reasons a conspiracy requires at least two conspirators, and if

one of two conspirators dies before an overt act is committed, the crime is not complete.

The cases Alleyne cites support the first part of his reasoning but not the second. In *People v. Austin* (1994) 23 Cal.App.4th 1596, 1603 [28 Cal.Rptr.2d 885] and *People v. Superior Court (Jackson)* (1975) 44 Cal.App.3d 494, 498 [118 Cal.Rptr. 702], the courts noted at least two people were needed to conspire, but the cases did not involve the death of a conspirator. Instead, they involved the acquittal of coconspirators. (*People v. Austin, supra*, 23 Cal.App.4th at p. 1603; *People v. Superior Court (Jackson), supra*, 44 Cal.App.3d at p. 498.) Alleyne cites no authority, and we have found none, that explains how the death of one of two conspirators, who have entered into the requisite agreement, could affect the culpability of the other conspirator who goes on to commit an overt act in furtherance of the conspiracy.

*People v. Eberhardt* (1985) 169 Cal.App.3d 292 [215 Cal.Rptr. 161], cited by the Attorney General, suggests the death of the only other coconspirator does not terminate the conspiracy or extinguish the culpability of the remaining conspirator. In *Eberhardt*, the defendant argued he could not be culpable for violations of certain fishing laws because the only other conspirator, his Native American wife, was immune from prosecution due to her heritage. The court found the wife's immunity did not affect the husband's culpability, distinguishing *People v. Superior Court (Jackson), supra*, 44 Cal.App.3d at page 498, on the ground it involved innocence of the alleged coconspirator, not immunity. (*People v. Eberhardt, supra*, 169 Cal.App.3d at pp. 299-300.)

Like the wife in *Eberhardt*, the deceased Allen was immune from prosecution, albeit for a much harsher reason. Alleyne argues *Eberhardt* is distinguishable because Allen was immune from prosecution before an overt act was committed. But Eberhardt's wife was likewise immune before any overt act was committed; she was always immune.

Holding that the surviving conspirator is culpable for proceeding with an overt act is consistent with the rationale for making conspiracy a crime. "The theory behind th[e] principles [of conspiracy law] is that collaborative criminal activities pose a greater potential threat to the public than individual acts. 'Criminal liability for conspiracy, separate from and in addition to that imposed for the substantive offense which the conspirators agree to commit, has been justified by a "group danger" rationale. The division of labor inherent in group association is seen to encourage the selection of more elaborate and ambitious goals and to increase the likelihood that the scheme

will be successful. Moreover, the moral support of the group is seen as strengthening the perseverance of each member of the conspiracy, thereby acting to discourage any reevaluation of the decision to commit the offense which a single offender might undertake. And even if a single conspirator reconsiders and contemplates stopping the wheels which have been set in motion to attain the object of the conspiracy, a return to the status quo will be much more difficult since it will entail persuasion of the other conspirators. [Citations.]' [Citations.]" (*People v. Tatman* (1993) 20 Cal.App.4th 1, 8 [24 Cal.Rptr.2d 480].)

"The punishable act, or the very crux, of a criminal conspiracy is the evil or corrupt agreement. [Citations.]" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 244 [15 Cal.Rptr.2d 112].) Allen entered into an agreement with Alleyne to kill Wengert. Allen's death terminated his life but not the agreement. All that was left to make the agreement punishable as a conspiracy was Alleyne's perpetration of an overt act in furtherance of the agreement. The shooting was certainly that and established Alleyne's culpability.[1]

## II-V*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Sills, P. J., and Crosby, J., concurred.

A petition for a rehearing was denied August 21, 2000, and on August 10, 2000, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 15, 2000.

---

[1]Because we conclude the Allen-Alleyne conspiracy survived Allen's death, we need not consider whether sufficient evidence showed a conspiracy between Alleyne and the person who apparently drove him to and from the Wengert shooting.

*See footnote, *ante*, page 1256.