Filed 8/10/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C078620 |
| Plaintiff and Respondent, | (Super. Ct. No. SF128800A) |
| v. | |
| CHESTER LLEWELL BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Richard Mallet, Judge. Affirmed.

The Law Offices of Janelle Caywood and Janelle E. Caywood, Retained Counsel for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Peter W. Thompson, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Chester Llewell Brown guilty of two counts of human trafficking involving two different victims.  During the trial, the jury heard evidence that defendant was essentially pimping minors, in at least one instance against their will.

Proposition 35, the Californians Against Sexual Exploitation Act (sometimes referred to as the CASE Act), adopted by the People at the 2012 General Election, was designed in part to protect trafficked minors by treating them as victims, not criminals, and ensuring they receive services to protect them from exploitation.  (See *In re M.D.* (2014) 231 Cal.App.4th 993, 998-999.)  Defendant's claims concern the application and certain aspects of this law.

Defendant first notes that D. Doe (D.), the named victim in count two, was treated as his coconspirator for the purpose of introducing hearsay evidence.  D. was a 14-year-old prostitute who helped defendant recruit 17-year-old prostitute B. Doe (B.), the named victim in count one, to work for him.  D. did not testify, but her statements and texted conversations with defendant were introduced.  Defendant argues that because D. was immune from prosecution for trafficking under Proposition 35, she could not have been his coconspirator, and her out-of-court statements therefore constitute inadmissible hearsay.  As we will explain, we conclude that D. was properly deemed an uncharged coconspirator for purposes of Evidence Code section 1223, and that Proposition 35 does not compel a ruling to the contrary.

Defendant next contends the human trafficking statute is void for vagueness and duplicates conduct contained in the pandering statute (Pen. Code, § 266i, subds. (a)(6) and (b)(2)),[1] which provides for lesser penalties.  He claims these duplicative provisions allow for discriminatory enforcement.  He adds that Evidence Code section 1161, subdivision (b), which excludes evidence of prior prostitution activity by victims of

---

[1]  Further undesignated statutory references are to the Penal Code.

trafficking, violates various constitutional principles. We shall reject these contentions of error as well, and affirm the judgment.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts, viewed in the light most favorable to the verdicts (see *People v. Abilez* (2007) 41 Cal.4th 472, 504), showed that defendant, using D. as his key assistant, induced B. to prostitute herself in Stockton.

*Trial Evidence*

Stockton Police Officer Wesley Grinder testified as an expert on prostitution. He explained that a "blade" is an area known for heavy streetwalking, and there are blades in Stockton. In addition to advertising by wearing skimpy clothing and waving at passing cars, prostitutes use many Internet sites, on some of which they post pictures of themselves. Often a prostitute is not allowed by her pimp to use phones; those are controlled either by the pimp himself, or by a so-called "bottom bitch," who stays near the working prostitute. These "bottom bitches" act as a pimp's right hand by screening clients. They are loyal, and help insulate the pimp from liability. Isolating prostitutes from the outside world and any support system they may have is a common way to facilitate their compliance.

On the late afternoon of May 25, 2014, Stockton Police Officer Terrance Washington was sent to look into a reported kidnapping, and went to a gas station near the Motel 6 on Plymouth Road. He found a teenage girl (B.) sitting on the ground amidst suitcases, dressed in "short shorts and a low cut halter top," distraught and "crying hysterically." She said she was afraid for her life, wanted to get away from "Chester," and wanted the police to call her father. Washington and other officers waited for

---

[2] Alternatively, defendant claims his trial counsel was ineffective for failing to raise these last two issues. Because we address the merits of all the issues raised, we do not address defendant's claims of ineffectiveness of trial counsel.

3

"Chester" and arrested defendant when he soon drove by in a car with three female passengers. When stopped and asked his name, defendant said it was "Bakori Newton" and he claimed to be 17 years old. After detaining defendant, Washington spoke to D., one of the females in the car. She was wearing cut-off shorts. Condoms and many credit cards were found in the glove compartment. A book entitled "The 40 Laws of the Game: Pimpology" was found in the trunk, and some of the pages were highlighted. Nearby, Officer Robert Dominguez found a telephone by the car, which rang when Washington dialed the number B. had for defendant. Later, defendant admitted it was his telephone.

B. reported that defendant forced her to create an account on an Internet site; the account showed her in an advertisement for an "escort," gave her location, and had photographs that displayed her breasts and genitalia. Washington researched defendant's telephone number on the Internet and discovered the number was associated with several different websites bearing similar ads. A photograph on one site resembled another one of the females who had been found in defendant's car when it was stopped. B. was 17, and D. was 14. The other girls in the car with defendant were 16 and 14.

Detective Michael George spoke with D. on May 27, 2014, at juvenile hall. On her telephone he found Internet escort advertisements associated with the numbers of D.'s and defendant's telephones. He obtained a warrant to search defendant's telephone. The search revealed photographs--including of B.--depicting prostitution-related activities, such as young females in suggestive poses with telephone numbers to call to arrange meetings.

B. testified she was 17 on May 23, 2014, and had met defendant that March in Antioch. They texted each other and visited once at her cousin's apartment. Defendant told her he was a pimp and told her "how much money you could make, and stuff like that. Kind of persuasive." He assured her he could protect her, but she just considered him a casual friend.

4

Trial exhibit 56 consisted of 79 pages of mostly redacted texts taken from defendant's telephone--with the subscriber name of "Bakori Brown"--beginning before and lasting until the end of the charged offenses. At times B. was flirtatious with defendant in these texts, and when he asked for naked pictures of her, she complied. On May 12, 2014, he proposed taking her to Stockton over a weekend, to work as a "ho." In further texts, she said she was scared, but he told her it was easy and he would protect her and teach her the trade. Later texts, sent while the two were in Stockton, discussed prices for sexual acts, and the need for B. to keep in touch with defendant when she was on a "date."

On May 23, 2014 (Friday), B. texted defendant, who knew she was only 17, because she had had an argument with her mother and wanted to talk to him. She left her mother's home to go with defendant, who drove her to Stockton. D. was in the car. The three eventually went to a motel. There, while the girls were alone, D. told B. they would walk "the blade" and she would take pictures of B. to post on an Internet escort site.[3] B. protested that that was not why she had come with defendant to Stockton, but then defendant came in and said it was a " 'money weekend' " and "ya'll going to do this, ya'll going to do that." D. took "exotic pictures" of B. and they were posted on "a call girl website," along with her telephone number. Because nobody called, they got dressed and went out to the streets. Defendant drove both girls to a "ho stroll" at about 9:00 p.m., and during this time D. told B. "what type of person" defendant was, and B. recorded D. on her telephone describing defendant.

Soon a man picked B. up, they had sex in a house, and he paid her $60, the amount defendant had told her to ask for. She gave that money to defendant. She was terrified and felt she had no choice but to comply. After she and D. returned to the motel,

---

[3] A defense hearsay objection was overruled.

5

defendant accused B. of having had a customer she had not told him about. He told her he should kill her, and that he needed to know everything she was doing at all times. B. and D. strolled again for about an hour, then defendant took them back to a motel. Defendant saw the recording on B.'s telephone, in which D. had described (in apparently negative terms) defendant's "demeanor and what he's about" to B. He and D. argued, and he beat and choked her in front of B. He made D. strip naked and told her to leave that way, claiming everything she had belonged to him. D. left, but returned shortly and stayed.

The next morning (Saturday) the girls got dressed to return to the "blade." B. had another customer, and when it was over again gave defendant the money. That night, while D. was with a customer, defendant forced B. to fellate defendant. He told her that if she told anyone he would beat her worse than he had beaten D. On Sunday morning defendant again asked B. to fellate him, which she did.

When B. asked to go home, defendant's reply was " 'Some money need[s] to be made before anybody can go anywhere.' " Another time he said he would "beat [her] ass," and "don't play with me." Two other girls were with them and were depicted in photographs introduced at trial; an officer testified these were the two other girls found in defendant's car.

An incident where a customer offered $200 to let him rape B. caused her particular distress about her situation, although the rape did not occur. Eventually B. called 911. According to the 911 transcript in the record, the accuracy of which the parties do not dispute, B. reported that she had been kidnapped, but then hung up. The dispatcher called back and then B. spoke as if she were speaking to a customer, asking to meet in a motel, discussing the price and details. The 911 dispatcher understood B. could not speak freely and arranged for her to go to a particular motel. There were further 911 calls, and B. was able to tell the dispatcher the man was named Chester, he "worked me as a prostitute" and held her against her will, and he had other prostitutes in the car. On

6

cross-examination, B. admitted she had worked as a prostitute before she had ever met defendant. But she had not intended to work as defendant's prostitute that weekend, with him as her pimp, and give up control of her "choices."

A jailhouse informant, Tyquan Jeter, had been convicted of (misdemeanor) false imprisonment and domestic violence in 2013, and was facing jail time because he did not complete certain classes. He came forward with alleged statements defendant made while they were incarcerated together, and was promised that if he testified truthfully and completed the required classes, he would not have to serve additional time. He also had a 2007 theft conviction. Defendant had been his cellmate for a week or two and said he was "pimping, he had four underaged girls, three overaged girls. He had made a lot of money. He got caught because the girl called and said . . . something like she was kidnapped or whatnot." Defendant had been around pimping all his life, his father having been a pimp and his mother having been a prostitute. He had a tattoo of the word " 'pimp' " on his hand, but tried to hide it. He told Jeter a girl who was going to testify was named B., and asked Jeter to contact her "and just tell her not to show up." Defendant told Jeter one of his girls "wasn't picking up the phone, and he said something like 'Bitch, don't ever do that again. Bitch, I'll kill you if you don't answer your phone.' " He bragged about making money with seven girls, and said he would "post the [girl's] ass" on certain websites. He did not care that some of his girls were underage.

An employee from Metro PCS testified as an expert about cellular tower information. He identified the subscriber of defendant's telephone as Bakori Brown, and authenticated trial exhibit 56, containing the text messages from that telephone. A crime analyst testified he had examined three telephones relevant to this case (B.'s, D.'s, and defendant's) and had prepared trial exhibit 128, a PowerPoint reflecting the information from the telephones. This included photographs and videos, including of B. He found some of the racy or semi-naked photographs from the Internet escort sites on defendant's telephone, and many texts discussing prostitution activities.

7

D. did not testify. However, her juvenile records showed she had had prior police contacts for loitering for purposes of prostitution in Oakland.

Defendant testified he first met D. on a website, and met her in person in May 2014. He first met B. in Antioch. On May 23, 2014, he picked D. up "from the ho stroll" in Oakland and then drove to Antioch to pick up B. Eventually they went to a motel in Stockton. He had intended that D. would teach B. how to steal (from men for defendant), but B. was already a prostitute and did not want to steal. Later, B. went out "hoing, I guess." She asked to be taken to the "blade" and "[D.] was watching her back." On Sunday, B. asked him to take her home and he agreed, but he picked up two other girls on the way. He and B. had an argument because defendant had things to do and she could not pay for the gas needed to drive her to Antioch. He eventually dropped her off with all of her things, and was stopped by the police. He never had sex with B., although he admitted that--at his request for "sexy" pictures--she sent him pictures of her vagina, buttocks and breasts, and that on May 24, she texted him regarding fellatio. According to defendant, Tyquan Jeter was lying, and had access to defendant's paperwork, from which he could have learned about his case. Defendant took no money from B. Both girls were prostitutes before he met them, and he was only trying to help them.

Defendant admitted a juvenile adjudication for felony assault with a firearm. He had lied about his name to the officer when he was stopped because he had an outstanding warrant and did not have his driver's license. He admitted he had " 'pimp' " tattooed on his hand, as well as " 'pay me,' " but denied he was a pimp. He claimed he was performing rap music on videos in which he used the term "pimp." In some texts from his telephone he said he was a pimp, or the exchanges clearly referenced specific sex transactions, but he claimed some were not from him, and others just reflected his "image." He admitted that Internet escort photographs of B. were on his telephone, and his telephone number was on at least one of the websites. He claimed B. "put herself on the blade."

8

Many texts from defendant's phone referenced prostitution and included explicit photographs for websites and reference to specific sexual acts for specific dollar amounts. D. referred to defendant as "Daddy" in texts. Defendant denied he and D. planned to use B. as a prostitute, but claimed they were going to "train her to steal." He insisted he was not a pimp, testifying: "I can't stop nobody from doing nothing. Everybody [makes their] own decisions."

*Closing Arguments and Verdicts*

The prosecutor emphasized the evidence that defendant acted and spoke like a pimp, and even tattooed his hand to declare himself as such, and therefore he was a pimp. Defendant also lied about his name when stopped by the police, and tossed his telephone out of the car, evidencing consciousness of guilt. The prosecutor pointed to defendant's effort, via his cellmate Tyquan Jeter, to influence B. not to testify, and to a text directing D. to delete her texts, both evidencing defendant's consciousness of guilt. He emphasized that consent did not matter for a charge of human trafficking; even if the girls were willing prostitutes, and even if defendant thought they were 18, he was still guilty of those charges. Part of the trafficking law incorporated the crime of pandering, which was persuading the girls, successfully or not, to act as prostitutes. An uncharged criminal conspiracy existed, because the evidence showed defendant and D. had agreed to traffic B. This was significant because each member of a conspiracy was responsible for the acts or statements of other members made in aid of the conspiracy. Thus, D.'s texts that tended to incriminate defendant could be used to do so if the prosecution showed by a preponderance of the evidence they were in aid of a conspiracy.

Defense counsel emphasized the presumption of innocence beyond a reasonable doubt, and the rule that if two reasonable interpretations of circumstantial evidence exist, the jury must interpret that evidence in favor of the defendant. She emphasized discrepancies or exaggerations by B., and argued B. became angry at defendant and made

9

up her story. She also emphasized that D. did not testify and argued defendant's testimony that he was trying to wean the girls from prostitution to robbery was plausible.

The jury deadlocked on two charges of oral copulation with a minor (§ 288a, subd. (b)(1), both alleging B. as the victim) but found defendant guilty of both charged counts of human trafficking--one count for trafficking B. and one count for trafficking D. (§ 236.1, subd. (c)). Defendant admitted a strike (assault with a firearm). (§§ 245, subd. (a)(2); 667, subd. (d), 1170.12, subds. (b)-(i).) The trial court sentenced him to 21 years four months in state prison; defendant timely appealed.

## DISCUSSION

### I

#### D.'s Texts and Other Statements

In his opening brief, defendant claims: "Extensive evidence of texts between [defendant] and [D.] were admitted in which [defendant] appears to be making dates and setting fees for [D.] in May of 2014." However, defendant fails to describe the details of the challenged texts, citing to exhibits 56 and 128 in their entirety and three pages of the expert's trial testimony. He adds that B. was permitted to testify about "[D.]'s statements that they were going to take photographs, post them to [the Internet], and walk 'the blade,' " citing to testimony about the conversation. He contends such evidence should not have been admissible as to count two, the trafficking charge naming D. as the alleged victim. He does not challenge the evidence as admitted to support count one, the charge naming B. as the alleged victim.

A. *Background*

The People moved in limine to introduce texts from defendant to both victims to show he induced or persuaded them to engage in commercial sex acts. The defense replied that text messages should be redacted "to only relevant text messages." When exhibit 56--containing texts from defendant's telephone--was discussed, defense counsel objected that some did not have anything to do "with the two girls [who] are involved in

10

this." On some individual pages, it was not clear to whom a particular text (such as "ready to get some money?") was sent or to whom it referred; therefore the parties redacted exhibit 56 extensively to address defense counsel's objections. The in limine motion did not address D.'s oral statements, as opposed to her text conversations.

The parties expected D. would testify, and after B. testified, the prosecutor told the court he anticipated D. would testify the next day. But the next morning, the prosecutor advised that he had learned D. was afraid and did not want to testify. The trial court mentioned that whether or not D. testified, she was a coconspirator and therefore jury instructions on that issue would be required. Defense counsel did not then object.

During the instructional conference, when the conspiracy instructions were discussed, defense counsel simply stated "if she doesn't show up tomorrow, she's probably not coming." But later, defense counsel objected that because D. was a minor, she could not be a coconspirator. The trial court replied that D. was not a coconspirator as to the count alleging *she* was a victim, but only as to the counts alleging *B.* was a victim. Defense counsel argued the human trafficking laws made D. a victim for "any crime" related to trafficking. The court stated that where B. was the victim, the evidence showed D. was, in the trial court's words, "the bottom bitch." Defense counsel argued texts from D.'s telephone were inadmissible hearsay and violated defendant's right of confrontation. Defense counsel did not explicitly address D.'s oral statements.

The trial court ultimately ruled D.'s statements would be admissible as to both trafficking counts, and the jury was so instructed.[4] No objection was interposed to this change of the scope of the tentative ruling.

---

[4] At first the relevant part of the instruction referenced "text statements of alleged co-conspirator [D.] Doe," but it later referred to "text[s] or statements in order to further the goal of the conspiracy." As indicated earlier, the thrust of the defense objection was to the extensive texts between D. and defendant, although the jury also heard B.'s testimony

11

B. *Contentions*

Defendant contends (1) admission of D.'s statements violated the confrontation clause, and (2) D. could not be a coconspirator (as to count two only, which referenced her as the victim), because of Proposition 35.

Defendant's confrontation clause claim fails because defendant's briefing does not explain how any of D.'s statements were testimonial. (See *People v. Clark* (2016) 63 Cal.4th 522, 563-564 & fn. 37; *People v. Sanchez* (2016) 63 Cal.4th 665, 689 ["Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial"]; see also *Crawford v. Washington* (2004) 541 U.S. 36, 56 [158 L.Ed.2d 177, 195-196] ["Most of the hearsay exceptions covered statements that by their nature were not testimonial--for example, business records *or statements in furtherance of a conspiracy*"], italics added.)

Defendant's Proposition 35 claim is predicated on Evidence Code section 1161, subdivision (a). This statute as enacted by section 4 of Proposition 35 provided: "Evidence that a victim of human trafficking, as defined in Section 236.1 of the Penal Code, has engaged in any commercial sexual act as a result of being a victim of human trafficking is inadmissible to prove the victim's criminal liability for any conduct related to that activity."[5] One case has held this section applies only where the child prostitute engaged in a sex transaction "as a result" of being a human trafficking victim. (*In re Aarica S.* (2014) 223 Cal.App.4th 1480, 1487-1488 [upholding delinquency adjudication;

_____

about alleged oral communications between her and D., or which she overheard between D. and defendant.

[5] A minor amendment effective January 1, 2014 changed "for any conduct related to that activity" to "for the commercial sexual act." (Stats 2013, ch. 126, § 1.)

12

minor was " 'an independent contractor' "].)  Another has assigned the minor the burden to show that she was a victim in order to invoke this statute.  (*In re M.D.*, *supra*, 231 Cal.App.4th at pp. 999-1001.)  A third case has held that Evidence Code section 1161, subdivision (a) applies to protect minors in delinquency proceedings.  (*In re N.C.* (2016) 4 Cal.App.5th 1235, 1243-1245.)  Defendant's claim is that, because D. enjoyed some kind of protection from prosecution to the extent she was a victim--the precise scope of which we need not decide--she could not be defendant's coconspirator as to count two.

Defendant's claim cannot be squared with the coconspirator exception to the hearsay rule.  Evidence Code section 1223 permits the introduction of evidence of statements "made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy" if "made prior to or during the time that the party was participating in that conspiracy."

As the Attorney General points out, defendant does not contend insufficient evidence supported a finding that D. met the general statutory definition of a coconspirator, or that the evidence did not support any of the alleged overt acts.  Instead, his claim is that the evidentiary shield provided to her by Proposition 35 removes her from consideration as a coconspirator, at least as to count two, in which she is the named victim.

Although this claim might have some superficial appeal, under settled law, generally it does not matter whether or not an uncharged coconspirator is prosecutable, or instead enjoys immunity, in determining the application of the coconspirator exception.[6]

---

[6] Further, as the trial court pointed out, and the Attorney General notes, the bulk of the texted statements admitted at trial would be admissible against defendant either as party admissions (Evid. Code, § 1220), because he wrote them, or adoptive admissions (Evid. Code, § 1221), because he responded to the texted statements as though they were true. Defendant does not fully address this point, but merely faults the Attorney General for being vague about the statements in question.

"By definition, a conspiracy is an agreement, and requires the guilty concurrence of at least two parties. [Citation.] Therefore, a defendant in a prosecution for conspiracy cannot be convicted where all of his or her alleged coconspirators have been acquitted. [Citation.][7] *However, impossibility of conviction is not the same as innocence, and if the guilt of two is established, one may be convicted although the other may be protected by immunity or some other procedural bar.* (Perkins & Boyce, Criminal Law (3d ed. 1982) [Conspiracy,] pp. 693-694.) For example, the acts of a coconspirator who has been granted prosecutorial immunity may be considered in establishing the culpability of other coconspirators. [Citations.] 'Where . . . the discharge of an alleged coconspirator is not inconsistent with his guilt, but simply bars a subsequent prosecution of him, it does not invalidate the conviction of his coconspirators.' [Citation.] Similarly, a defendant may be charged with conspiracy to deliver documents to a foreign government even though his coconspirators are not amenable to prosecution because of diplomatic immunity." (*People v. Eberhardt* (1985) 169 Cal.App.3d 292, 299-300, italics added; see *People v. Alleyne* (2000) 82 Cal.App.4th 1256, 1261, 1262 [approving *Eberhardt*; the fact a coconspirator died before any overt act occurred did not alter the defendant's liability for the unlawful agreement: "Allen entered into an agreement with Alleyne to kill Wengert. Allen's death terminated his life but not the agreement. All that was left to make the agreement punishable as a conspiracy was Alleyne's perpetration of an overt act in furtherance of the agreement"]; *People v. Williams* (1979) 97 Cal.App.3d 382, 395 ["the grant of immunity to Ms. Hoover is not inconsistent with her culpability as a coconspirator. Her acts in furtherance of the conspiracy may therefore be considered in establishing the culpability of her fellow coconspirators"].)

Application of this rule would allow D.'s statements, whether oral or texted, to be admitted so long as they were made in furtherance of the conspiracy, and defendant does not contend any of the statements introduced at trial did not further the conspiracy.

Although not clearly briefed by defendant, we acknowledge that there is an exception to the above general rule where there is found "in the law declaring [an alleged coconspirator] incapable [of prosecution for the target offense], a policy precluding liability *not only for the target offense but also for a conspiracy to commit it*." (4 Wharton's Crim. Law (15th ed. 1996) Conspiracy, § 683, p. 549, italics added.) The

---

**7** This rule does not apply in California. (See *People v. Palmer* (2001) 24 Cal.4th 856, 861-867 [rejecting the so-called "rule of consistency" in conspiracy cases].)

14

seminal case cited by Wharton involved the conviction of a man and a *willing* woman for conspiring to violate the Mann Act (popularly known as the federal "White Slavery" statute), which generally provided that "[t]ransportation of a woman or girl whether with or without her consent, or causing or aiding it, or furthering it in any of the specified ways, are the acts punished, when done with a purpose which is immoral within the meaning of the law." (*Gebardi v. United States* (1932) 287 U.S. 112, 118 [77 L.Ed. 206, 209].) After acknowledging the coconspirator rule, the high court held:

> "[W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an *affirmative legislative policy to leave her acquiescence unpunished*. We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter. It would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers." (*Gebardi v. United States*, *supra*, 287 U.S. at p. 123 [77 L.Ed. at pp. 211-212], italics added; see *People v. Buffum* (1953) 40 Cal.2d 709, 722 [abortion-seekers not deemed accomplices under § 1111, whose testimony required corroboration in prosecution for conspiracy to commit abortions, because the conspiracy rule "does not apply where the statutes defining the substantive offense disclose an affirmative legislative policy that the conduct of one of the parties involved shall be unpunished"; however, they were subject to the corroboration requirement applicable to abortion-seekers provided by § 1108], overruled on another point by *People v. Morante* (1999) 20 Cal.4th 403; see also *Hutchins v. Municipal Court* (1976) 61 Cal.App.3d 77, 83-84.)

This exception does not help *defendant*. D. is not appealing after a conviction (or delinquency adjudication) for conspiracy to traffic herself. Evidence Code section 1161, subdivision (a) provides an evidentiary exclusion that *could* shield *D.* from prosecution. It provides that certain evidence "is inadmissible *to prove the victim's criminal liability . . . .*" (Italics added.) Defendant does not point to any provision in Proposition 35 that operates to limit proof of the *trafficker's* criminal liability, whether in the form of

15

statements admissible via the coconspirator hearsay exception or otherwise. We see nothing in the text or spirit of Proposition 35 to support such a result. Instead, it contains an explicit legislative purpose to " 'ensure just and effective punishment of people who promote or engage in the crime of human trafficking.' " (*In re M.D.*, *supra*, 231 Cal.App.4th at p. 999; quoting from Prop. 35, § 3.)

We find further guidance for our conclusion in *People v. Bogan* (2007) 152 Cal.App.4th 1070, cited by defendant. There, we found that a legislative purpose to treat prostitutes as misdemeanants meant they could not be *charged* as coconspirators with their pimps, because that would elevate their conduct to felony status, frustrating the legislative purpose of the statutory scheme. (*Id.* at p. 1075; see *People v. Pangelina* (1981) 117 Cal.App.3d 414, 422; *Williams v. Superior Court* (1973) 30 Cal.App.3d 8, 12-14.) However, we also found prostitutes could be treated as *uncharged* coconspirators, as D. was in this case. (*Bogan,* at p. 1075.) In part we relied on an earlier case that "upheld the admission of statements made by the defendant's suspected prostitutes under the coconspirator exception to the hearsay rule." (*Id.* at p. 1076; discussing *People v. Ambrose* (1986) 183 Cal.App.3d 136, 139 ["A prostitute, while exploited, is not criminally blameless"].)[8]

Thus, *Bogan* bolsters our view that even though Proposition 35 strengthened protections for human trafficking victims by limiting the evidence that can be introduced against them, it does not preclude treating them as *uncharged* coconspirators for purposes of the coconspirator exception to the hearsay rule. Indeed, as stated *ante*, that result

---

[8] We note that in *Bogan*, the defendant conceded a prostitute could be liable as a coconspirator with her pimp if she "assists in the exploitation of another person." (*People v. Bogan*, *supra*, 152 Cal.App.4th at pp. 1074, 1075.) That was the theory in this case as to count one, naming B. as the victim.

advances the purpose of Proposition 35 by facilitating prosecution of traffickers, rather than giving them the benefit of an evidentiary exclusion designed for their minor victims.

Thus, D. was properly treated as an uncharged coconspirator for purposes of the coconspirator exception to the hearsay rule, and evidence of her statements was admissible to show defendant's liability as to both human trafficking counts.

## II

### *Overlapping Statutes*

Defendant makes two interwoven claims hinging on the fact that, as the case was prosecuted against him in particular, the human trafficking statute overlapped with provisions of the pandering statute. We reject these connected claims.

Defendant contends section 236.1 is void for vagueness because, as applied to him in this case, it incorporated the definition of pandering as provided by section 266i. The jury was instructed that pandering was the underlying sex transaction for which defendant's liability under section 236.1--if any--would attach. He contends he was not given fair notice of what punishment he might face because pandering provides a lesser penalty than trafficking. He separately contends this overlap allows for selective enforcement of penal laws, and speculates about implicit bias and racial disparities in prosecutorial charging decisions.

We reject each of defendant's contentions, which we discuss together.

We agree with defendant that a penal statute must be drafted with sufficient clarity to give fair notice of what conduct is proscribed (or mandated). (See, e.g., *People v. Heitzman* (1994) 9 Cal.4th 189, 199; *People v. Vincelli* (2005) 132 Cal.App.4th 646, 650-651.) The high court explained this point in a case invalidating a California statute (§ 647, former subd. (e)) that required a detained person to provide credible identification to peace officers upon penalty of arrest for disorderly conduct:

17

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.] Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine--the requirement that a legislature establish minimal guidelines to govern law enforcement.' [Citation.] Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " (*Kolender v. Lawson* (1983) 461 U.S. 352, 357-358 [75 L.Ed.2d 903, 909].)

The challenged statute defined "disorderly conduct" as applicable to anyone "[w]ho loiters or wanders upon the streets or from place to place without apparent reason or business and who refuses to identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification." (Pen. Code, § 647, former subd. (e), added by Stats. 1961, ch. 560, § 2, p. 1672; see *People v. Solomon* (1973) 33 Cal.App.3d 429, 437-438 [construing this statute to require production of "credible and reliable" identification].) It was held to be infirm in part because it "vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest. An individual, whom police may think is suspicious but do not have probable cause to believe has committed a crime, is entitled to continue to walk the public streets 'only at the whim of any police officer' who happens to stop that individual under § 647(e)." (*Kolender v. Lawson*, *supra*, 461 U.S. at p. 358 [75 L.Ed.2d at p. 909].)

Defendant contends section 236.1, subdivision (c) is vague under *Kolender* and similar cases because it "fails to give the ordinary person fair notice of the conduct that constitutes 'human trafficking' as opposed to 'pandering.' " We agree with defendant's premise that as charged in this case defendant might have been subject to either of two

18

statutory schemes carrying different penalties, but we disagree with his conclusion that this renders the statute under which he stands convicted infirm.[9]

Section 236.1, subdivision (c) provides in part:  "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, *a person who is a minor* at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section 266, 266h, *266i,* 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking."  (Italics added.)  A commercial sex act is "sexual conduct on account of which anything of value is given or received by a person."  (§ 236.1, subd. (h)(2).)  Trafficking a minor triggers a punishment triad of five, eight, or twelve years and a fine up to $500,000.  (*Id*., subd. (c)(1).)  If force or fear is used, the punishment is 15 years to life and a fine of up to $500,000.  (*Id*., subd. (c)(2).)

Pandering is punished less harshly.  Section 266i, subdivision (a)(6) provides that any person who does the following is guilty of pandering:   "Receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution, or to come into this state or leave this state for the purpose of prostitution."  Pandering an adult *or* a minor 16 years or older triggers a punishment triad of three, four, or six years.  (*Id*., subds. (a), (b)(1).)  Pandering a younger minor triggers a punishment triad of three, six, or eight years.  (*Id*., subd. (b)(2).)  A panderer is subject to fine of up to $5,000.  (§ 266k, subd. (a).)

---

[9] The Attorney General weakly asserts the two charges do not overlap, because section 266.1, subdivision (a)(6) requires the giving of a thing of value for prostitution, "while section 236.1, subdivision (c), does not."  But as for the latter offense, the jury was instructed it had to find defendant committed the former offense, and that a commercial sex act for purposes of section 236.1 means "sexual conduct on account of which anything of value is given or received by any person."  (§ 236.1, subd. (h)(2).)  And the prosecutor argued to the jury that pandering was a component of the trafficking charge. Accordingly, for purposes of this appeal, we will accept defendant's view that the charges as prosecuted in this case overlapped.

Because defendant's predicate offense under section 236.1, subdivision (c) was pandering under section 266i, defendant views it as unfair that he is subject to the greater punishment triad and possible fine provided by the former statute. He suggests this means a person of ordinary understanding is not given fair notice of which statute is violated when pandering a minor. Further, he contends this circumstance--that he might have been punished as either a panderer or a trafficker--opens the door to invidious prosecutorial charging determinations.

Although defendant tries to distinguish *United States v. Batchelder* (1979) 442 U.S. 114 [60 L.Ed.2d 755] (*Batchelder*), we agree with the Attorney General that it forecloses his claim.

At issue in *Batchelder* were "two overlapping provisions of the Omnibus Crime Control and Safe Streets Act of 1968 (Omnibus Act). Both prohibit convicted felons from receiving firearms, but each authorizes different maximum penalties. We must determine whether a defendant convicted of the offense carrying the greater penalty may be sentenced only under the more lenient provision when his conduct violates both statutes." (*Batchelder*, *supra*, 442 U.S. at pp. 115-116 [60 L.Ed.2d at p. 759], fn. omitted.) A lower court had concluded the lesser punishment should be applied as a matter of Congressional intent, including the need to avoid the constitutional doubt that might ensue if prosecutors had unfettered discretion to charge defendants under either statute. (*Id*. at pp. 116-117 [60 L.Ed.2d at pp. 759-760].) The high court unanimously disagreed, in part holding:

> "It is a fundamental tenet of due process that '[no] one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.' [Citation.] A criminal statute is therefore invalid if it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.' [Citations.] So too, vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute. [Citations.]

20

"The provisions in issue here, however, unambiguously specify the activity proscribed and the penalties available upon conviction. [Citation.] That this particular conduct may violate [two statutes] does not detract from the notice afforded by each. Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." (*Batchelder*, *supra*, 442 U.S. at p. 123 [60 L.Ed.2d at p. 764].)

That is exactly the situation in this case. Two statutes each clearly advised defendant of conduct that was criminal, and of the possible penalties each provided.

Regarding *possible* selective or discriminatory enforcement, the high court said:

"This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants. [Citations.] Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion. [Citations.]

"The Court of Appeals acknowledged this 'settled rule' allowing prosecutorial choice. [Citation.] Nevertheless . . . the court distinguished overlapping statutes with identical standards of proof from provisions that vary in some particular. [Citation.] In the court's view, when two statutes prohibit 'exactly the same conduct,' the prosecutor's 'selection of which of two penalties to apply' would be 'unfettered.' [Citations.] Because such prosecutorial discretion could produce 'unequal justice,' the court expressed doubt that this form of legislative redundancy was constitutional. [Citation.] *We find this analysis factually and legally unsound*.

"Contrary to the Court of Appeals' assertions, a prosecutor's discretion to choose between [the two statutes] is not 'unfettered.' Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints. And a decision to proceed under [the statute with the more severe punishment] does not empower the Government to predetermine ultimate criminal sanctions. Rather, it merely enables the sentencing judge to impose a longer prison sentence than [the other statute] would permit and precludes him from imposing the greater fine authorized by [the other statute]. More importantly, there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. . . . The prosecutor may be influenced by the penalties available upon conviction, but this

21

fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. [Citations.] Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced." (*Batchelder*, *supra*, 442 U.S. at pp. 123-125 [60 L.Ed.2d at pp. 764-766], italics added, fn. omitted.)

Our Supreme Court has followed *Batchelder* and permitted prosecutors to make charging decisions that implicate different penalty provisions, so long as those decisions are not made for invidious reasons (e.g., race, gender, etc.). (See *People v. Wilkinson* (2004) 33 Cal.4th 821, 834-836 [rejecting equal protection claim]; see also *People v. Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 395 ["It is axiomatic the Legislature may criminalize the same conduct in different ways"].)[10]

Defendant cites *Johnson v. United States* (2015) 576 U.S. __ [192 L.Ed.2d 569], a case holding a particular sentencing statute was, *by its terms*, vague; however, that case is distinguishable. *Johnson* involved a "residual" clause defining a violent felony for penalty purposes as one presenting " 'a serious potential risk of physical injury to another,' " and invalidated this clause because "the indeterminacy of the wide-ranging inquiry . . . both denies fair notice to defendants and invites arbitrary enforcement by judges." (*Id.* at pp. ___, ___ [192 L.Ed.2d at pp. 576, 578].) That is not the situation here. Nonetheless, relying on *Johnson*, defendant claims that *Batchelder* only applies to

_____

[10]  A footnote in *Batchelder* emphasized: "The Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' [Citation.] Respondent does not allege that his prosecution was motivated by improper considerations." (*Batchelder*, *supra*, 442 U.S. at p. 125, fn. 9 [60 L.Ed.2d at p. 765, fn. 9].) Similarly, although defendant raises the specter of discriminatory charging based on race, he did not make any motion or objection in the trial court urging any such discrimination occurred in this case. *Batchelder* and *Murgia v. Municipal Court Bakersfield Judicial Dist.* (1975) 15 Cal.3d 286 at pages 290-291 teach that a charging decision based on race or other invidiously selected class violates equal protection. This protection vitiates defendant's contention that overlapping statutes are *per se* invidious. And nothing in the record on appeal indicates invidious discrimination occurred in this case.

"statutes fixing sentences," and claims here the problem goes deeper. We disagree. As we have explained, to the extent defendant's conduct could have been charged as either pandering or human trafficking--the former with less severe penalty provisions than the latter--defendant has no legitimate complaint, because there is no vagueness about what the law prohibited under either statute. That different possible criminal labels and penalties may be attached to defendant's acts is unimportant under the reasoning of *Batchelder,* where a felon possessing a firearm could have been charged under either of two statutes. So, too, here: Although defendant might have been both a panderer and a trafficker, that does not mean the prosecutor was obligated to charge him with the more lenient of the two offenses, nor that either of the two statutes is vague.

III

*Exclusion of Evidence of Past Prostitution*

Evidence Code section 1161, subdivision (b) provides: "Evidence of sexual history or history of any commercial sexual act of a victim of human trafficking, as defined in Section 236.1 of the Penal Code, is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding." Defendant contends Evidence Code section 1161, subdivision (b) is unconstitutional because it violates the due process clause and his rights to confrontation and to present a defense. He faults the use of the term "victim," which in his view is prejudicial because until a trial occurs "no 'victim' yet exists."

To the extent defendant is making a facial challenge, we reject it. In context, the word "victim" is used in the statute as a synonym for "complainant," "complaining witness," or the older term "prosecutrix." (See, e.g., *People v. Long* (2010) 189 Cal.App.4th 826, 840; *People v. Branch* (2010) 184 Cal.App.4th 516, 521.) It is unreasonable to suppose the use of the word "victim" in the statute would prejudice a trial court's evidentiary rulings, as any rational trial court would understand the context of the term, and would not presume the defendant was guilty before trial.

23

To the extent defendant is making an as-applied challenge to this statute--a challenge the People properly note was not made in the trial court--we reject it as well. The defense theory was defendant was trying to wean the girls from prostitution by teaching them to make a living by robbing their customers. In addition to defendant's testimony to the effect both girls were already prostitutes, B. testified she had been a prostitute before she met defendant, and D.'s juvenile record was introduced, showing her history of loitering for purposes of prostitution. Thus, it was not disputed *in this case* that both girls were prostitutes *before* the charged offenses, and defense counsel so argued to the jury. Therefore, regardless of the trial court's in limine ruling excluding evidence, we fail to see--and defendant fails to explain--how the statute deprived defendant of any relevant evidence *in this case*. Defendant does not explain how further *details* about the prior prostitution history of either girl would have bolstered his defense, he merely assumes that the statute impaired his case. In short, defendant does not establish with reference to the record how he was prejudiced by the statute in this case, given the state of the evidence admitted.

Further, the jury instructions used "alleged victim," "alleged victims" and "complaining witness"; therefore this jury never heard either B. or D. referred to in the instructions as a "victim" because of the challenged statute.

Thus, we reject defendant's challenges to Evidence Code section 1161, subdivision (b).

## DISPOSITION

The judgment is affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Butz, Acting P. J.

_____/s/_____
Renner, J.