Filed 7/23/21  P. v. Lockett CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B301103 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA058054) |
| v. | |
| JOSHUA R. LOCKETT et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Reversed and remanded with directions.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Joshua R. Lockett.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant Terrell D. Henderson.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

Petitioners Joshua R. Lockett and Terrell Henderson were convicted of the murder of Brandon Houston. They appeal from the denial of their petitions for resentencing under Penal Code section 1170.95.[1] Among other things, Petitioners[2] contend the trial court's findings are not supported by substantial evidence and they are entitled to relief under Senate Bill No. 1437 (SB 1437). We agree. We therefore reverse the order denying Petitioners' petitions for resentencing with directions.

## PROCEDURAL BACKGROUND[3]

*The Underlying Crime*

On November 29, 2012, Brandon Houston and Ke'ana Moore, Houston's girlfriend and the mother of his infant son, had a heated argument and shoving match. The electricity had been turned off in the Lancaster apartment where they lived, and Houston was jealous because he discovered Moore had been texting an ex-boyfriend. Although Moore wanted to leave, Houston did not want her to take the baby away from the house. At trial, one of Houston's sisters testified Houston told Moore he did not want another man coming over to pick up Moore and his son. The sister remembered Moore telling Houston "he was going

---

[1]     All further section references are to the Penal Code unless otherwise specified.

[2]     We consider Petitioners' arguments together because they make similar arguments in their separate appeals, and each has joined in the other's arguments.

[3]     We repeat the facts and the trial proceedings as set forth in our previous opinion, *People v. Lockett, et al.* (Nov. 6, 2015, B256242) [nonpub. opn.], on which the parties also rely.

2

to get his." Houston walked outside to calm down. Moore called her sister and asked for a ride.

Henderson, Lockett, and Randy Sullivan (the defendants)[4] arrived in a black SUV that Henderson was driving. Henderson and Sullivan are brothers; Lockett is their cousin. Henderson was dating Moore's sister. Houston and his 14-year-old nephew, D.S., were sitting on the steps outside the apartment. The defendants and Houston were all acquainted. Houston had once fought Lockett when they were both in high school.

Upon arriving at the apartment building, Henderson honked the horn. Moore came outside with her baby (Houston's son). Henderson got out of the car and moved the seat so that Moore could get in. Sullivan and Lockett were still in the car. As Moore went to the SUV, Houston told her to wait. When Moore protested, Houston said he wanted to kiss his son.

As Houston was walking away from the SUV, Henderson bumped or pushed him and told him to move. Houston backed up and prepared to hit Henderson. D.S. told Henderson: "Don't put your hands on my uncle." Henderson and D.S. "squared up," or prepared to fight. By this time, D.S.'s mother and Houston's sister, Chrishonda Coulter, had joined the group. Either Houston or Coulter told Henderson, "You aren't going to fight him," referring to D.S., "he's 14." Coulter told Henderson that D.S. was not grown, indicating that if Henderson had a problem with D.S., he had a problem with her.

Sullivan got out of the SUV, took off his shirt, and said, "I'm Southside Crip. Where you from?" Sullivan was a self-

---

[4] Henderson, Lockett, and Sullivan were jointly tried for Houston's murder. While Sullivan also filed a petition for resentencing, he is not a party to this appeal.

admitted gang member. Houston responded, "I'm not with that." Coulter said she knew some people from "190," a Crips gang in Carson.[5] Sullivan said, "We don't get along with those, they just killed one [of] us." Houston told Sullivan, "It's not about that. It's about you guys coming to my mom's house being disrespectful."

Sullivan shook hands with Houston and said he "had love" for Houston, Moore, and their son. However, Henderson and D.S. were still arguing, and Coulter attempted to intervene. Houston's mother threatened to call the police. Henderson and Sullivan got back into the SUV. As defendants and Moore drove away, Henderson yelled that they would be back. In the car, Sullivan said he needed to call one of his "homies" to tell them he just got into it with someone from 190. He did not call anyone at that time. The defendants dropped Moore off and drove away.[6]

Meanwhile, Houston and D.S. walked to a liquor store. Houston and D.S. encountered some of Houston's friends who had heard Houston was "getting jumped." As Houston and D.S. were talking to the friends, they saw the SUV drive past. Coulter and her sister had joined Houston and D.S. Between 10 and 20 minutes had passed since Henderson said he would be back. D.S. saw the defendants and two other people in the SUV.

---

[5]     Coulter testified at trial that while this discussion of gangs occurred, "[i]t wasn't about that. It was about respecting my mom's home."

[6]     On cross-examination, Moore testified that while she was in the SUV there was no discussion of anyone getting a gun, and no discussion at all of the Compton Southside Crips.

4

Lockett was driving. Henderson pointed at Houston's group.[7] The SUV drove in a back alley through a nearby shopping center. D.S. saw the SUV circle the area once, then he lost sight of it. Houston, along with his friends and family, continued walking, only to meet the group from the SUV walking straight over to them. The defendants were accompanied by a fourth man, Denelle Wilson, who some of Houston's group knew as "Baby Frost" or "Jack Frost." Wilson was in a relationship with Henderson's and Sullivan's sister. A fifth man wearing a black hoodie and a yellow or gold shirt lagged behind. No one with Houston recognized the fifth man.

The two groups met. One of Houston's friends, Aaron Chism, knew Henderson and Lockett; they had gone to school together and Chism described them as "homeys." Chism also had seen Sullivan around; they shook hands. Sullivan said, "How do you want to do this?" When D.S. asked what he meant, Sullivan said, "You said you want to fight my brother," referring to Henderson.[8] Henderson said he wanted to fight D.S., but Coulter

---

[7] On cross-examination, Coulter testified she waved the SUV down.

[8] According to Coulter, in response to Sullivan's question, "everybody was like 'we all came to fight.'" On cross-examination, Coulter testified that Henderson said he wanted to fight D.S.; Coulter said D.S. was a kid and Henderson would have to fight her. Henderson responded: "'Ma'am, my mother taught me better than that. I am not going to hit you.'" The fight broke out. Coulter blacked out and fell to the ground. When she woke up, she saw a guy standing over Houston, shooting him. Coulter indicated she did not remember being punched and did not know if she lost consciousness because of a blow or because of health reasons.

said she would not allow it because D.S. was underage. Henderson ran up and punched D.S. in the nose. Everyone began fighting. Sullivan was fighting one of Houston's friends. Lockett was fighting Houston.

The fifth man wearing a hoodie was hiding behind a car. He was not fighting anyone. Suddenly, he left his position by the side of a car and approached the middle of the crowd.[9] He fired two shots in the air. Everyone scattered and began running away. The shooter pointed the gun at one of Houston's friends, shot, and missed. The shooter then looked at Houston. Houston turned and tripped on the curb. The shooter shot Houston in the leg, then approached, stood over him, and fired multiple shots at him. D.S. testified the only person he saw with a gun or weapon was the shooter.

The defendants, Wilson, and the shooter ran back to the SUV. They drove to the home of Shemita Cartwright, Henderson and Sullivan's sister, and Wilson's girlfriend. Police arrived sometime later and apprehended the defendants, but not the shooter. The black SUV was parked inside a closed garage. Police recovered cell phones in the house; the call and message history had been deleted from each phone. Law enforcement was unable to locate the shooter.

*The Trial Proceedings*

The defendants were charged in a single-count information with murder. (§ 187, subd. (a).) The information also alleged the defendants committed the crimes for the benefit of, at the direction of, and in association with a criminal street gang with

---

[9] One of Houston's friends testified he did not see the shooter before the shots were fired, "because the shooter, he did like a magic trick. He just appeared out of nowhere."

the intent to promote, further and assist the gang (§186.22, subd. (b)(1)(C)) and that a principal personally and intentionally discharged a firearm which caused great bodily injury and death (§ 12022.53, subds. (b)–(e).) It further specifically alleged Henderson suffered a prior strike conviction (§§ 667, subd. (d) and 1170.12, subd. (b)) and Sullivan served two prior prison terms (§ 667.5). The defendants pleaded not guilty and denied the special allegations.

At trial, the prosecution presented evidence of the events as described above. The prosecution also offered the testimony of two gang experts. The first expert explained that in gang culture, respect "is huge," and "a perceived act of disrespect can go anywhere from a verbal altercation to a shooting . . . at any second." He suggested that in a "territorial, South Central L.A. gang mentality," an incident or threat that disrespects the gang would have to be addressed. When presented with a hypothetical based on the facts of the case, the expert opined the brawl was a distraction that allowed the shooter to conduct a daytime execution that would benefit the gang.

The second gang expert testified about the Southside Compton Crips. He indicated they "associate with the color blue, sometimes black, blue and gold, because they'll often wear lettered attire, and . . . some of their attire is the Seattle Mariners' attire, where it would be blue and gold . . . you'll have a gold 'S' on a blue hat." He also opined that, based on a hypothetical similar to the facts of the case, he would conclude the shooting was gang-related. He further testified: "They left together, they came back together, they . . . left the scene together, and it's been in my experience over the years, gang members going to a rival area or against a rival, they're usually

7

going to make sure—especially if they're going in another neighborhood—that they are protected and they have a weapon. And in all the cases that I can recall, the persons in the car are going back to commit the crime, with the early assault or the shooting, are aware that there is a weapon in the car."

Lockett also offered the testimony of a gang expert. In response to a hypothetical mirroring the facts of the case, the expert opined the cousin of the person invoking the Southside Crips gang name would not be associating for the benefit of the gang. He opined the facts represented a confrontation related to family matters, and both groups appeared to have the expectation of merely a fight, with the exception of the shooter. The expert did indicate if the shooter was from the Southside Compton Crips, his opinion would be that the shooting was likely for the benefit of the gang. However, he further explained that the mere shouting of gang names does not automatically mean a person is "gang banging."

Lockett testified on his own behalf.[10] According to Lockett, at the time of the incident, Henderson and Lockett were living in the same house. Henderson's girlfriend (also the mother of his child) asked him to pick up her sister, Moore. As Henderson and Lockett were leaving the house, Sullivan called and asked for a ride because his bicycle tires were flat. As the three defendants pulled up to Houston's house, Lockett could see that Houston was agitated. Lockett knew Houston; they had previously had an altercation in high school. However, they had not had any

---

[10] Prior to trial, Lockett was caught attempting to pass a note to Henderson while in jail. The note detailed a version of the events leading up to and including the shooting. At trial, Lockett's testimony was consistent with the note.

problems since, and Houston had been to Lockett's house multiple times. Moore was crying as she walked to the SUV. Houston approached to kiss the baby. D.S. was behind Houston. Sullivan tried to help Moore get the baby in the car. Lockett was sitting in the passenger seat. He did not know exactly what happened, but Henderson and D.S. ended up having an altercation. Houston and Sullivan exchanged words. Lockett got out of the car to let Sullivan out of the backseat. The exchange between Henderson and D.S. grew more heated. Coulter and Sullivan made gang references. Lockett did not intervene, because, as he explained: "I don't have anything to do with gangs, so I don't know. I don't want to say anything about it." He denied being a gang member or associating with gangs. He testified Sullivan was his cousin. Sullivan sometimes went to his mother's house, where Lockett was living, so "of course" Lockett hung out with him. But Lockett and Henderson were close and went everywhere together.

In Lockett's version of events, Sullivan told Houston they had not come to disrespect Houston's house. Houston, observing Henderson and D.S., said there would be no fighting right there. Instead, "If you wanna fight, you all drop my son off and come back in front of the apartments to fight." Once Lockett got back into the car, Henderson pointed to D.S. and said, "I'll be back for you." After they drove away, Sullivan said he was going to call someone. Henderson responded: "You don't have to call nobody, this between me and [D.S.]." Sullivan did not call anyone. They dropped Moore off. They left again, with Lockett driving. Henderson called Wilson. Lockett thought Henderson was going to get Wilson and they were all going to a fight. Lockett went along because of Henderson. Once in the car, Wilson asked if

9

they could pick up his cousin.[11] Lockett responded that he did not put gas in the car and was "just the person with a valid license." Wilson directed them to a house where he met someone at the front door. He returned to the car with a man he introduced as his cousin Darren. Lockett did not see any weapons on Darren. There was no discussion of weapons. Everyone greeted Darren and introduced themselves. Lockett had never met Darren before. Lockett drove to the designated location of the fight. He drove past Houston's group on the street because he did not realize it was them. However, there were people in the street flagging down the car. No one in the car made any statements relative to gangs, flashed gang symbols, referred to having a gun, or mentioned weapons. There was talk of everyone fighting, if necessary. Lockett was going back for Henderson to fight D.S. If multiple guys tried to jump Henderson, Lockett was prepared to defend his cousin.

Lockett parked the car, and everyone got out. Lockett did not talk to Darren. When they met Houston's group, Sullivan shook someone's hand. Sullivan asked, "How you guys wanna do this?" Henderson said he wanted to fight D.S. D.S. took off his shirt and began walking toward Henderson. Coulter also walked toward Henderson, saying if he was fighting D.S., he would have to fight her. Henderson said he would not fight Coulter, indicating his mother had raised him "better than that," and he would not hit a woman. After that, everyone was in the middle of

---

[11]    Lockett testified that Wilson said, "his cousin . . . [was] going back to his brother Robert house, and he asked me can I go pick him up." On cross-examination, Lockett testified the defendants picked Wilson up at his brother Robert's house. Lockett also admitted on cross-examination that Wilson "was called backup."

10

the street, some running around, some "squaring off," or preparing to fight, and some fighting. Lockett began looking for Henderson. Lockett was hit, or he tripped and fell. As he was getting up, he saw someone wearing a black hoodie run past. Shots rang out. As it turned out, Houston was killed. Lockett was scared for his life, so he ran. He began to vomit. He made his way back to the SUV and handed the car keys to Sullivan. He thought the man in the black hoodie might have been the man Wilson brought, and he "didn't want any part of that." They all went to Lockett's cousin's house. No one spoke in the car. Lockett was scared. He again vomited. He saw Wilson tell Darren, "Let's go." The two left. Sometime later the police arrived.

Lockett also offered the testimony of his cousin, Shemita Cartwright. Cartwright testified the defendants, Wilson, and a fifth man wearing a black hoodie came to her house. She only saw the fifth man briefly before he left with Wilson. She had never seen him before. On cross-examination she testified that when she opened the door for the group, no one was saying anything, throwing up, screaming, or sweating, nor did they look nervous. She testified that the fifth man was not one of Wilson's two cousins she had seen before. She also admitted on cross-examination that during an interview with police on the day of the incident, she did not tell them that a fifth man wearing a black hoodie came to her house with Sullivan and Petitioners.

*Argument, Deliberations, and Verdicts*

In his closing argument, the prosecutor argued the defendants engaged in a premeditated, deliberate murder of Houston. The prosecutor asserted that when Sullivan said he had to call someone because of the issue with 190, the person

11

called was the shooter; Lockett drove because they all knew there was a gun in the car and they wanted no problems if they were pulled over by police; and the shooter hid during the brawl because they all had a plan. The prosecutor argued the shooter would only know the defendants had a "beef" with Houston if Petitioners and Sullivan had told him. He asserted the shooter was wearing gang colors, he hid and did not get involved in the street fight, and he waited until he could sneak into the crowd and kill Houston. The prosecutor further repeatedly argued the incident was a premeditated and planned gang crime, reasoning that if the shooter was just a guy "picked up out of the blue, why not just start shooting everybody, right? Just start blasting." The prosecutor contended the group had to come back because "gang members don't fight fair," the group felt disrespected and, in accordance with gang culture, they had to "get a guy with a gun" and "make a statement."

The jury was instructed on first and second degree murder. The court also instructed on both direct aiding and abetting liability, and the natural and probable consequences doctrine, with assault and battery identified as the target offenses. While deliberating, the jury asked the following questions: "Does each defendant have to touch [Houston] for battery to apply?"; "Does aiding and abetting as to assault and battery apply to our understanding of [Instruction No.] 960 [battery]?"; "Can you provide clarification as to natural and probable consequences in [Instruction No.] 403 [natural probable consequences]. Example please? Definition for 'probable.' Definition of 'natural.' "

The jury found the defendants not guilty of first degree murder. It found each defendant guilty of second degree murder but found the associated gang enhancement not true. The trial

12

court sentenced Lockett to a total prison term of 15 years to life. Henderson was sentenced to a total prison term of 30 years to life, plus 5 years. The court sentenced Sullivan to a total prison term of 17 years to life.

*Petitions for Resentencing*

In 2019, Petitioners Lockett and Henderson sought resentencing under section 1170.95, asserting they could not now be convicted of murder because they were convicted under the natural and probable consequences doctrine. The People opposed on the grounds SB 1437 was unconstitutional, and Petitioners were ineligible for resentencing because they were major participants in the underlying felony who acted with reckless indifference to human life or they personally acted with malice aforethought.

The trial court found Petitioners had made a prima facie showing they were eligible for relief and appointed counsel to represent them. After further briefing from the parties, the trial court issued an order to show cause why relief should not be granted and set an evidentiary hearing.

At the August 2, 2019 hearing, the prosecutor indicated he intended to rely solely on the record of conviction to meet his burden of proof to show Petitioners were ineligible for resentencing. Petitioners did not seek to admit any new evidence to supplement the record of conviction. The trial court questioned whether the acquittal of the first degree murder charge affected the court's evaluation of express malice. The prosecution asserted the jury's finding had no effect because "the trial court can look at all the evidence, and the trial court can make an independent decision, which is what the law says, if this is an express malice case." Lockett's counsel argued the

13

jury's previous finding established "the prosecutor had not proven beyond a reasonable doubt that this was premeditated murder or that it involved express malice." Henderson's counsel further argued, "The jury clearly rejected the first degree theory in this case. If they want to find first degree, there's plenty of evidence that they could have done it, and they rejected all that evidence. And what is left is a situation where our clients came back and got into a fight, that the People's theory is that they got into a fight as a distraction for an unknown shooter. [¶] There was no reason to have to get into a fight. There's no relationship between the fight and what happened with the shooter because the fight was actually meaningless in terms of what happened with the shooting. They didn't have to start a fight, a distraction, for a shooting to happen[]. [The] shooting could have happened anyway." The court took the matter under submission.

The court subsequently denied the petitions in a memorandum of decision. It summarized its conclusions as follows:

> "1. This court held a hearing to determine whether 1) the Petitioners are entitled to relief where prosecution bears the burden of proof to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing (§ 1170.95, subd. (d)(3) and [(2)]) to determine if Penal Code section 1170.95 is constitutional.
>
> "2. The jury convicted Petitioners of 2nd degree murder under either the theory of aiding and abetting or the theory of natural and probable consequences. Because jurors are not required to disclose the theory under which they convict the defendant of murder or make any such special findings nor are they even required to agree on the theory of

14

conviction and in this case, the prosecution proceeded under both theories, it is not clear under which theory the jury convicted the Petitioners.

"3. This court finds that the Petitioners could be convicted of murder beyond a reasonable doubt under the law after January 1, 2019, under the theory that while the Petitioners were not the actual killers, they were principals who had the intent to kill and who aided and abetted the commission of the murder of Brandon Houston.

"4. Because this court finds that the Petitioners are not entitled to relie[f] under S.B. 1437, it elects not to make any findings as to the constitutionality of S.B. 1437."

The court then set forth a recitation of the facts of the underlying crime and the criminal proceedings against Petitioners as well as a summary of SB 1437. In its discussion of the case, it stated:

"After review of the entire court file, pleadings and arguments of counsel, this court finds that the prosecution has established beyond a reasonable doubt that all three Petitioners are guilty of second degree murder under the theory that while the Petitioners were not the actual killer, they each were principals who aided and abetted the commission of the murder . . . there was 'plenty of evidence,' to convict these defendants on first degree murder and the court agrees that [at] a minimum there is sufficient evidence to convict on second degree murder under aiding and abetting, and furthermore, sufficient evidence to convict on first degree murder as a principal under the aiding and abetting theory."

"The record reflects that the prosecution sought the petitioner's murder conviction based on multiple theories,

15

including first and second degree murder under *both* a direct aiding and abetting theory as well as natural and probable consequence theory, with assault and battery identified as the target offenses. Since the jury need not disclose its theory of liability or even agree on any particular theory, neither of the parties are able to show the actual basis of the petitioner's conviction. While questions about natural and probable consequence was discussed, there is no credible evidence to aid the court in determining what theory any particular juror relied upon in making its decision, if they were unanimous in their theory or there was a split in their decision as to the theory upon which they convicted each Petitioner. Nevertheless, it is the burden of the prosecution to show, beyond a reasonable doubt, that the petitioner is guilty of murder under the law effective January 1, 2019."

"For the petitioner to be eligible for relief, it must be shown that '[t]he petitioner could not be convicted of first or second degree murder because of the changes to Section 188 or 189 made effective January 1, 2019' (§ 1170.95, subd. (a)(3)[]) and this court finds that the Petitioners have not met this burden. In this case, when Petitioner Sullivan said he had to call someone because of the issue with 190, the person called was the actual killer Cedric Burton; Petitioner Lockett drove because they all knew there was a gun in the car and they wanted no problems if they were pulled over by police; and the shooter hid during the brawl because they all had a plan to distract the group allowing the killer to walk up and execute the victim. Specifically, the killer would only know the defendants had a 'beef' with Houston if the defendants had told him which is evidence of a discussion prior to their arrival at the scene and all had devised a plan to isolate the victim and kill

16

him. Also, the killer was wearing gang colors, hid when the others approached the victim and his group, and the killer did not get involved in the street fight. The killer waited until he could sneak into the crowd and kill Houston as planned. The reason the Petitioners return with the killer to kill the victim was because the group felt disrespected and, in accordance with gang culture, they needed to make a statement by killing the victim."

"This court finds that there is sufficient evidence to prove beyond a reasonable doubt that each Petitioner conspired with the actual killer Cedric Burton to kill the victim in this case, that they were principals in the murder, shared the intent to kill, and aided and abetted the actual killer in the murder. For the foregoing reasons, all three Petitioners['] request to be resentenced under Penal Code section 1170.95 is Denied."

Petitioners timely appealed.

## DISCUSSION

Petitioners challenge the trial court's order on several grounds: (1) the trial court erred by conducting a trial de novo and disregarding the jury's verdict and finding in violation of collateral estoppel; (2) the trial court applied the wrong standard of proof in resolving the petition; and (3) the evidence was insufficient to support the trial court's finding they acted with the intent to kill and directly aided and abetted the murder. We conclude reversal is warranted on the ground of insufficiency of the evidence. Having reached this conclusion, we need not address Petitioners' other grounds for error.

## I.    Penal Code Section 1170.95

SB 1437, which became effective on January 1, 2019, amended the felony murder rule and the natural and probable consequences doctrine to ensure that murder liability is not

imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Martinez* (2019) 31 Cal.App.5th 719, 722–723.) It did so by amending sections 188 and 189 and by adding section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2–4.)

Under section 1170.95, subdivision (a) a defendant may petition for resentencing if he or she was "convicted of felony murder or murder under a natural and probable consequences theory" and the following conditions are met: "(1) A charging document was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) The petitioner was convicted of first or second degree murder following trial or an accepted plea; and (3) The petitioner could 'not be convicted of first or second degree murder because of changes to Section[s] 188 or 189' made by Senate Bill No. 1437. (§ 1170.95, subd. (a).)" (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135–1136 (*Lewis*), review granted Mar. 18, 2020, S260598.)

Section 1170.95, subdivision (c) sets forth the procedure once the defendant files a complete petition: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the

18

petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

"Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence. This deadline may be extended for good cause." (§ 1170.95, subd. (d)(1).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges. The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).)

"If petitioner is entitled to relief pursuant to this section, murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes. Any applicable statute of limitations shall not be a bar to the court's redesignation of the offense for this purpose." (§ 1170.95, subd. (e).)

19

"A person who is resentenced pursuant to this section shall be given credit for time served. The judge may order the petitioner to be subject to parole supervision for up to three years following the completion of the sentence." (§ 1170.95, subd. (g).)

## II. Standard of Review

We employ the substantial evidence standard of review when considering a trial court's factual findings made in connection with its section 1170.95, subdivision (d) determination. (*People v. Clements* (2021) 60 Cal.App.5th 597, 618, review granted April 28, 2021, S267624.) "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

The substantial evidence standard is the same whether the evidence is direct or circumstantial. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) "A reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork; a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence. [Citations.]" (*People v. Rekte* (2015) 232 Cal.App.4th 1237, 1247.) This is because suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact. (*People v. Redmond*

20

(1969) 71 Cal.2d 745, 755.)  Moreover, we must determine whether the evidence of each of the essential elements of the crime is substantial; it is not enough for the respondent to simply point to "some" evidence supporting the finding.  (*People v. Bassett* (1968) 69 Cal.2d 122, 138.)

"Whether a particular inference can be drawn from the evidence is a question of law."  (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1604, disapproved on other grounds by *People v. Palmer* (2001) 24 Cal.4th 856, 864.)  Although all reasonable inferences must be drawn in support of the judgment, we "may not 'go beyond inference and into the realm of speculation in order to find support for a judgment.  A finding . . . which is merely the product of conjecture and surmise may not be affirmed.' "  (*People v. Memro* (1985) 38 Cal.3d 658, 695 disapproved on other grounds by *People v. Gaines* (2009) 46 Cal.4th 172, 181.)

" ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933.)  We may reverse for lack of substantial evidence only if " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " the trial court's finding.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Finally, the sufficiency of the evidence must be assessed in light of the prosecution's theory of conviction in the trial court. (*Cole v. Arkansas* (1948) 333 U.S. 196.)  In order to conform to due process of law, "[defendants are] entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court."

(*Id*. at pp. 201–202; see also *People v. Smith* (2005) 37 Cal.4th 733, 740.)

### III.    Second Degree Murder

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]  Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied.  [Citation.]  'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.]' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Criminal liability extends to "[a]ll persons concerned in the commission of a crime," and all those who "aid and abet in its commission."  (§ 31.)  Guilt as a direct aider and abettor to second degree murder requires:  (1) knowledge of the direct perpetrator's intent to commit the crime; (2) intent to assist in committing the crime; and (3) conduct that in fact assists in committing the crime.  (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

SB 1437 did not alter the law regarding the criminal liability of direct aiders and abettors to murder because such persons necessarily " 'know and share the murderous intent of the actual perpetrator.' " (*Lewis, supra,* 43 Cal.App.5th at p. 1135.)  Thus, "relief must be denied if the People establish, either based on the record of conviction or through new or additional evidence, that the defendant personally acted with malice."

22

(*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1114, review granted Nov. 13, 2019, S258175.)

IV. **The Evidence Was Insufficient to Support the Trial Court's Finding of Malice**

The trial court concluded "that each Petitioner conspired with the actual killer Cedric Burton to kill the victim in this case, that they were principals in the murder, shared the intent to kill the victim, and aided and abetted the actual killer in the murder." Based on the trial court's conclusions, our task is to determine whether substantial evidence supports the trial court's conclusions: (1) that Lockett and Henderson separately knew Burton intended to kill; (2) that Lockett and Henderson shared Burton's intent to kill; and (3) that Lockett and Henderson, by act or advice, aided, promoted, encouraged, or instigated the commission of the murder. (CALCRIM No. 401.) Based on our review of the record, substantial evidence does not support the trial court's conclusions on the required elements for aiding and abetting a second degree murder.

All parties acknowledge there was no direct evidence Petitioners knew of or shared the killer's criminal intent or conspired with him to kill Houston. Rather, the trial court drew inferences from the circumstantial evidence that: (1) the person Sullivan called from the SUV was the actual killer; (2) Petitioners knew there was a gun in the car; (3) they all had a plan to distract the group with a brawl while the killer hid and waited to shoot Houston; (4) the killer targeted Houston because Petitioners told him they had a "beef" with Houston; (5) the killing was gang-related because the killer wore gang colors; and (6) they had a motive to kill Houston because they felt

23

disrespected and, in accordance with gang culture, they needed to make a statement by killing him.

The trial court inferred Sullivan called the actual killer solely from Sullivan's statement that he had to call "one of my homies" to report the issue with 190. The record shows two additional men, Wilson and Burton, accompanied the Petitioners and Sullivan back to meet up with Houston and his group. The inference that Sullivan called Burton and not Wilson, even if reasonable, does not further establish an additional and necessary inference that both Lockett and Henderson shared in Burton's intent to kill Houston.

The trial court next drew the inference that because Lockett (who had a valid California driver's license) drove back instead of Henderson, the Petitioners knew there was a gun in the SUV. A reasonable inference may be made that Lockett, who was the only one with a valid driver's license, drove back to Houston's neighborhood because Petitioners "wanted no problems if they were pulled over by the police." While the fact that Petitioners did not want problems with the police may reasonably support the additional inference they knew there was a gun in the SUV, it does not support two further inferences: they knew the shooter intended to kill Houston with that gun and they shared that intent with him.

Next, the trial court concluded Petitioners had a plan to distract Houston's group with a brawl to allow the shooter to walk up and execute the victim. The People presented no reasonable theory to explain why Petitioners needed to distract Houston and his group so the killer "could sneak into the crowd and kill Houston as planned." There simply is no rational

inference that the Petitioners engaged in the brawl as a ruse to allow Burton the chance to sneak in for the kill.

Likewise, the evidence does not support the trial court's inference the killer targeted Houston because Petitioners told him they had a "beef" with Houston. Instead, the evidence showed Coulter claimed an affiliation with 190 when Sullivan asked Houston, "Where you from?" Sullivan later stated he "had love" for Houston, Moore, and their son. Moreover, Henderson's altercation was with D.S., Houston's nephew. Coulter stepped between them to stop them from fighting and indicated that if Henderson had a problem with D.S., he had a problem with her. Houston, on the other hand, disclaimed any gang affiliation and told Sullivan he only had a problem with "you guys coming to my mom's house being disrespectful." He did not interfere in Henderson's argument with D.S.

There is also no evidence to support the fifth and sixth inferences, both of which infer the crime was gang related. Specifically, the court relied on evidence the killer was a gang member because he wore gang colors and Petitioners had a motive to kill Houston because they felt disrespected and, in accordance with gang culture, they needed to make a statement by killing him. While the color of Burton's clothing may support an inference he was a gang member, there is a gap in logic to conclude the Petitioners, i.e., Lockett and Henderson, felt disrespected and needed to retaliate against Houston by killing him. The record does not support a finding Petitioners, who are not gang members, would be motivated to kill Houston, who was also not a gang member. Instead, the record shows Henderson was upset at D.S. and wanted to fight D.S., not Houston.

25

"Somewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails. When this happens, the inference becomes irrational speculation." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 369.) Here, the trial court's conclusions that Lockett and Henderson (1) knew Burton intended to kill Houston, (2) entertained an intent to kill Houston, and (3) took action to assist Burton kill Houston, was speculative. As such, the trial court's conclusions are not supported by substantial evidence.

## DISPOSITION

The order denying Petitioners relief under section 1170.95 is reversed. The matter is remanded to the trial court with directions to grant Henderson's and Lockett's petitions for resentencing and resentence them in accordance with section 1170.95. Thereafter, a copy of the court's order and an amended abstract of judgment should be sent to the Department of Corrections and Rehabilitation. Further, the court should report a resentencing under SB 1437 to the Department of Justice as required by section 13151.


OHTA, J.*

We Concur:


STRATTON, Acting P. J.          WILEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26